# EDWARD MINTURN *v.* JOHN D. BROWER AND JOHN HOWLETT.

TREATY OF GUADALUPE HIDALGO.—Mexicans who, previous to the acquisition of California by the United States, were established in and had acquired from the Governments of either Spain or Mexico a perfect title to lands in California, and who chose to remain in California, were, by the treaty of Guadalupe Hidalgo, protected in the ownership and enjoyment of the land the same as though no change of sovereignty had taken place.

MEXICAN GRANTS—AS TO CONFIRMATION.—Mexicans, whose titles to lands by grant from Mexico or Spain were perfect at the time of the acquisition of California by the United States, were not compelled to submit them for confirmation to the Board of Commissioners appointed under the Act of Congress of March 3d, 1851, nor did they forfeit their lands to the Government by a failure to present their claims for confirmation.

PERFECT TITLES.—The titles of such persons to their lands, which were perfect at the time of the acquisition of California by the United States, remained as valid under the new Government as they were under the old; and without having been presented to the Board of Commissioners for confirmation, may be asserted and maintained in the Courts of the country.

INCHOATE TITLES.—Where the titles to lands in California were inchoate and imperfect at the date of the treaty, it was necessary to submit them to the Board of Commissioners for confirmation within the time prescribed by the Act of Congress of March 3d, 1851, otherwise they became forfeited; and from that time such lands were deemed, held, and considered as part of the public domain of the United States.

PERFECT TITLES MIGHT BE SUBMITTED OR NOT.—Holders of titles to lands which were perfect at the date of the treaty, could, if they so elected, submit them to be passed upon by the Commissioners, but were not bound to do so.

EFFECT OF TREATY ON TITLES.—The provisions of the treaty of Guadalupe Hidalgo operated as a confirmation *in presenti* of all perfect titles to lands in California held under Spanish or Mexican grants made prior to its ratification.    P., a Mexican citizen, residing in California, had, at the time of its acquisition by the United States, a perfect title to a tract of land in California, granted to him by Spain in 1820.    In 1851 he died intestate, leaving him surviving sons and daughters.    The sons, claiming severally distinct portions of such tract by devise of their father, as they alleged, presented to the Board of Commissioners their respective claims to such portions of the land for confirmation, and the same was confirmed and patented to them as severally claimed.    The daughters were not parties to the petition presented to the Board, nor to the confirmations, nor to the patents issued.    The plaintiff, who had succeeded to the title and interest of one of the sons by grant of a distinct parcel of the portion of the land confirmed and patented to him, brought ejectment against the defendants, who had succeeded by grant to the title and interest of the daughters in and to the same parcel of land.    *Held*, that upon these facts, which were pleaded by the defendants, and admitted by the plaintiff to be true, the Court erred in giving judgment for the plaintiff.

APPEAL from the Third Judicial District, Alameda County.

The facts are stated in the opinion of the Court.

*H. K. W. Clarke*, for Appellants.

The Court below should have allowed defendants' evidence in support of their title and right of possession.

What was it? Why, substantially, that the land plaintiff sought to recover had been, previous to 1820, subject to disposition by the Spanish Government, a former proprietor and ruler of the country; that in that year it was granted by the then proprietor, in full and absolute property, to one Luis Peralta; that the latter was its owner and possessor for thirty years and upwards, until his death in 1851; that in the latter year he died intestate, leaving sons and daughters, and descendants of a deceased daughter, as his heirs and the inheritors of his estate; and that from a portion of these defendants deraigned title and right to the premises in question by direct mesne conveyances, and that defendants were in possession under and through the right thus acquired.

Why was it improper to allow this means of defense? The learned Court below answered, because the sovereign of the country, the Mexican Government—not the proprietor of the land—in 1848 had, by treaty, ceded its sovereignty over the country to the Government of the United States, and that the latter Government having, through Congressional legislation, established a tribunal to ascertain and settle private land claims in the ceded territory, to which all were invited, and to which resort had been had by one only of said sons and heirs, who had obtained, in a proceeding to which himself and the United States alone were parties, a decree of confirmation in his own favor of the entire granted estate, and to the exclusion, who were unheard and unnamed, of its other inheritors, through whom defendants claimed and derived their rights.

Was the Rancho of San Antonio, granted in fee to Luis Peralta thirty years ago by its then proprietor, and remaining in his uncontrolled possession from the date of the grant until 1851, the time of his death, property *belonging* to the United

States? If not, how could it have been disposed by or in virtue of an Act of Congressional legislation?

That it was the private property in fee simple and by perfect title of Luis Peralta at his death, and thence vested, not in A. M. Peralta, one of his heirs, but in him and *others* as tenants in common, through whom defendants derived, *was the very thing the offered evidence would have shown.*

The Act of Congress of 3d March, 1851, could not effect a change of proprietorship in and to perfect legal titles to lands vested in private individuals, under the laws of the former sovereign, nor was it so intended. This is not only manifest from a want of power to do so, but, in addition, it is unmistakably expressed by the words of its fifteenth section.

A treaty of cession is a deed or grant of one sovereign to another, and transfers nothing in which he had no right of property—and only such rights pass as he owned and could convey to the grantee.

By the treaty of Hidalgo, the United States acquired no lands in California to which any person had lawfully obtained such a right by perfect title.

Congress cannot constitutionally, by a *mere enactment*, deprive a citizen of his lawful estate; and if it should attempt it, this Court would not sustain such a spoliation act. (*United States* v. *Perchman*, 7 Peters, 87.)

The United States never had any title to the premises in controversy. It has been often decided: "That a patent is absolutely void and inoperative, where the State granting it has no title to the thing granted." This may be shown in an action at law. (*Stoddard et al.* v. *Chambers*, 2 How. 284–318; 9 Cranch, 99; 4 Cranch, 652; 5 Wheat. 293; 11 Wheat. 384; *Rice* v. *Railroad Co.*, 1 Black, 375; *Kyle & Thompson* v. *Tubbs*, 23 Cal.  .)

The defendants hold under an independent title that arose prior to the acquisition of the country by the United States, and are *third persons* within the meaning of the fifteenth section of the Act of 3d March, 1851. (*Waterman* v. *Smith*, 13

Cal. 420; *Biddle Boggs* v. *Merced Mining Co.*, 14 Cal. 362; *Leese* v. *Clark*, 20 Cal. 423–425.)

But, independently of this fifteenth section, the defendants are protected by the law of nations, treaty stipulations, and constitutional guarantees.    (See Constitution, Treaty with Mexico, and *United States* v. *Perchman*, 7 Peters, 86, 87.)

In the Court below, it was urged that *Estrada* v. *Murphy*, 19 Cal. 248, and *Lockwood* v. *Clark*, 21 Cal. 220, had virtually decided that the action of the United States tribunals, under the Act of 3d March, 1851, on the subject discussed under this head of our brief, was conclusive.

This is incorrect.    Both those cases were where Mexican grants had been confirmed on *imperfect* or equitable titles.    In this, the title was *perfect*, and needed no confirmation through an Act of Congress or judicial decree.    In those cases, before confirmation the legal title was in the Government.    It could do, in the matter of confirmation or rejection, as it thought fit. The fee was subject to its disposition, and having disposed of it its action was conclusive.

Where two or more persons have an equitable right to the same land, the fee of which is, before confirmation, *in the Government*, and a disposition of the fee is made to one to the exclusion of the other, it is not doubted, however wrongful such disposition may be, it is conclusive until it is set aside. But, not so as in the case here, where the title in fee was vested in individuals, and *not* subject to the disposition of the Government.

*E. W. F. Sloan*, for Respondent.

It is assumed that Luis Peralta was, in his lifetime, vested with a perfect title to the Rancho de San Antonio, and it is argued that a claim of that character need not be presented for confirmation to the Board of Commissioners.    That the Act of Congress makes no distinction between perfect and imperfect or inchoate grants, is too obvious to admit of controversy; consequently the power of Congress to enact the law is disputed.    If the Act of Congress is void, so far as by its terms

it is applicable to perfect legal titles, it must be because it is in violation of the Federal Constitution, or is contrary to common right. I deny that it is either the one or the other.

Article IV, section 3, of the Constitution of the United States, provides that "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

The State of California was "admitted into the Union upon the express condition that the people of said State, through their Legislature or otherwise, should never interfere with the primary disposal of the public lands within its limits."

Upon Congress, therefore, devolves the sole power of providing for the primary disposition of the public lands of the United States. The exercise of that power necessarily includes the means of ascertaining what is and what is not public land. The Government can see and act only through its officers and agents.

At the time of the passage of the Act in question, a vast territory had recently been annexed to the United States. This territory was then but sparely populated, yet it was correctly supposed that portions of it had become private property. In order to facilitate the orderly settlement of this territory, and the development of its ample resources, it became necessary for Congress to exercise the powers mentioned; to cause surveys to be made; to establish Land Offices; to constitute and appoint Registers and Receivers; to provide for sales, entries, and the issuance of patents. But before proceeding to dispose of the public lands, it was obviously requisite that such portions as had become private property should be ascertained and clearly defined, through the medium of official agents.

It is evident that officers, appointed for that purpose, must either proceed upon an inspection of such record evidence or other proof as they might be able to procure unaided by claimants, or the latter must have an opportunity to be heard.

The Act of Congress secured to each claimant a patient and

impartial hearing.   A tribunal was specially appointed for the purpose.   Ample time was given for the presentation of claims; and still further time was given for the introduction of proof in support of such claims.   In case of a rejection by the Board of Commissioners, an appeal was allowed to the District Court of the United States, where additional evidence could be introduced, with the privilege of again appealing to the Supreme Court.   The Surveyor-General was authorized and directed to cause accurate surveys to be made of all lands the claims to which should be finally confirmed; and patents therefor were directed to be issued to the respective confirmees. Thus, lands justly claimed to be private property, whether by titles perfect or imperfect, were rendered potentially secure against adverse titles from the Government of the United States.

It is impossible for Congress to have devised means more adequate to accomplish the end in view.   A higher purpose could scarcely have claimed the attention of the national Legislature.

If it is the duty of the Government to respect private rights which depend on imperfect grants, *a fortiori*, is it bound to protect those in the enjoyment of their property who hold lands by perfect titles ?

" The Government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means." (Per Mr. Chief Justice Marshall, in *M'Culloch* v. *State of Maryland*, 4 Wheat. 409, 410.)

A mere glance at the existing state of things in the acquired territory will disclose the necessity of Congressional action.

A few grants of land had been made by the Spanish Government; a greater number by that of Mexico.   These grants had never been regularly surveyed.   Rude *diseños*, intended to delineate some of the natural features of the lands of which grants had been solicited were, indeed, to be found in the archives; but even these were wanting in some *expedientes.*

82

Archive evidence consisted of petitions—with or without *diseños*—consultations, orders of reference, informations, correspondence, prohibitions, licenses, orders of concessions, etc., and all in a foreign language. *Diseños* generally represented a larger tract of land than was granted. Often, two or more *diseños* represented, in part, the same parcel of land. A sobranted clause was to be found in almost every *titulo*.

The giving of juridical possession—the last step in completing the title under the Mexican system—was performed by local officers, who retained in their own possession the record of their proceedings. The boundaries intended thereby to be fixed were generally so imperfectly described as to be uncertain.

Under the colonization system of Mexico, grants of land could only be made in writing, so that some sort of record evidence was supposed generally to be found; but it seems they might have been made orally, with livery, according to the Spanish system.

In such state of circumstances, it is not difficult to perceive how liable the Surveyor-General would have been to overlook even perfect grants, survey the lands included by them, and return the same as parts of the public domain of the United States.

An entry of the same land by strangers, and the issuance of patents, would naturally succeed, to terminate at last in litigious strife between the patentees and the original claimants. In such litigation it would be necessary for the latter to maintain their respective rights before juries—often prejudiced in favor of patentees; and to do so with a promptitude not required in the proceedings prescribed by the Act of Congress.

That Act confers, therefore, a special favor on all *bona fide* claimants of land under Spanish or Mexican grants. It provides for the confirmation of all just titles. It secures to the confirmees indisputable evidence of their respective rights in a form at once certain, compact, and convenient. It protects them against adverse grants from the United States. No other

duty was imposed upon claimants except that of presenting their respective claims, with the evidence upon which they are founded, within the time limited. There was a public necessity for the limitation. Whilst ample time was allowed for the presentation and establishment of all just claims, a restraint was placed upon the fabrication of false claims to an indefinite extent.

Can such an Act be charged with producing the confiscation of private property? An ordinary Statute of Limitations operates upon the remedy only, but in barring the remedy it often puts an end to the right. Such a law, however, even where enacted in reference to past transactions, has always been upheld by Courts, provided a reasonable time be given for the exercise of the remedy. (*Call* v. *Hagger*, 8 Mass. 429; *Strother* v. *Lucas*, 12 Peters, 447.)

"Acts of Limitation," says Mr. Chief Justice Marshall, "defeat a contract once obligatory, and may, therefore, be supposed to partake of the character of laws which impair the obligation of contracts. But a partial view of the subject will show us that the two laws stand upon distinct principles * * *. In prescribing the evidence which shall be received in its Courts, and the effect of that evidence, the State is exercising its acknowledged powers. It is likewise in the exercise of its legitimate powers when it is regulating the remedy and mode of proceeding in its Courts." (*Ogden* v. *Saunders*, 12 Wheat. 348, 349.)

It is unquestionably within the scope of ordinary legislative power, without destroying the right, to prescribe a period within which that right shall be asserted in Courts of justice. It is alike in harmony with the dictates of private justice and public policy to prescribe such limitation.

The law in question is not the result of State legislation, and is, therefore, not directly within the restriction imposed by the Federal Constitution against the passage by States of laws which impair the obligation of contracts. The principle upon which that prohibition rests, however, lies at the foundation of all proper legislation. The same may be said with

regard to the prohibition of *ex post facto* laws. These, and all similar restraints contained in the Constitution of the United States, were deemed sufficient to prevent the States from going beyond the limits of wholesome, legitimate legislation. They indicate what the most liberal and enlightened statesmen and jurists have regarded as the true limits of legislative power, beyond which it could not properly extend, but within which its exercise could be safely intrusted to that branch of government in which it was vested.

An Act of the Legislature of Pennsylvania, which declared valid the deed of a married woman, which was invalid before for want of a proper acknowledgment, was held to be free from constitutional objections, and of obligatory force, although the effect was to divest the right of the heirs.

"It is clear," says Mr. Justice Story, in a case in the Supreme Court of the United States arising under that Act, "that this Court has no right to pronounce an Act of the State Legislature void as contrary to the Constitution of the United States from the mere fact that it divests vested rights of property. The Constitution of the United States does not prohibit the States from passing retrospective laws generally, but only *ex post facto* laws." (*Watson* v. *Mercer*, 8 Peters, 110.)

Where Congress has legislative power over the subject matter, must it not be, as to that matter, equally extensive? The enactment in question, however, does not undertake to divest any settled right of property; but, on the contrary, to provide for its greater security. In doing so, it is true, it has imposed terms upon the claimant of the right; it requires reasonable activity on his part within a limited period, which he cannot safely refrain from exercising. But, has such legislation ever been condemned by jurists as contrary to common right or unjustly oppressive? Has it, when dictated by considerations of public policy, ever failed to receive the most unqualified judicial approbation? "It cannot be doubted," says Judge Martin, "that the title, or rights acquired under a contract, cannot be modified or affected by any subsequent

Act of the Legislature; but the means of enforcing such rights and protecting such titles—in other words, the remedy provided by law to insure the enjoyment of such rights and titles—is always in the power of the Legislature, who may extend or restrict it as circumstance may require." (*Patin et al.* v. *Prejean*, 7 La. 306.)

As heretofore suggested, a perfect title to land may have been derived from the crown of Spain without any writing whatever. The holder of such title would, of necessity, be compelled at all times to rely on the precarious security of oral evidence for its protection, unless the Government afforded him the means of procuring incontestable evidence thereof, of a permanent character, by record and letters patent. Could he justly complain of a law of the United States which provides the means for that purpose, which imposes no terms other than the submission of his claim, with proof of his right, within a reasonable period? A statute which should directly declare such a title null and void might be justly condemned; but the Act of Congress does nothing of the kind.

It is said, however, that a party owning property by a perfect legal title should be permitted to assert his right thereto in any Court of law, without the necessity of taking any active steps in reference to it which were not required by the law existing at the time the property was first acquired: that the imposition of such necessity, or of any terms or conditions whatever, is beyond the legislative power of any free and enlightened government. If so, our Legislatures have been in the habit of indulging, and our Courts of sanctioning the exercise of despotic power.

The Act of the Legislature of this State, approved April 25, 1863, (Chap. 365,) which imposes upon litigants the taking and subscribing of an expurgatory oath as a condition upon which alone they shall be allowed to prosecute or defend their rights in Courts of justice, has been judicially sustained.

Statutes of the State of New York, similar in the principle of their operation, were passed respectively January 8, 1794, and March 24, 1797. Those statutes have been approved and

enforced, both in the State and Federal Courts. (*Jackson* v. *Harrington*, 6 Cow. 137, 139 ; *Jackson* v. *Lamphire*, 3 Peters, 289, 290.)

They operated upon deeds of conveyance already executed, and by virtue of which perfect legal titles to real estate have been acquired. They compelled the holders of those deeds to register and lodge them in a particular office, on or before a given day, upon peril of not being entitled to read them in evidence in support of such titles.

The Act of Congress, like the statutes last referred to, does not vacate or annul any grants of land ; but, on considerations of public policy and private right, prescribe a convenient remedy by which those grants might be permanently established, and the property thereon dependent rendered perfectly secure.

A large majority of those who claimed the ownership of lands in California at the date of the conquest were not vested with titles definitively valid ; in few instances had concessions been approved by the Departmental Assembly or Territorial Deputation, and still more rarely had juridical possession been given. And though the fee may be regarded as having passed to the United States by the transfer of the territory, yet it was subject to the equitable rights of those grantees ; and it devolved on this Government to complete that which would have been accomplished by the former sovereign but for the change.

So far as the enactment in question applies to claims of that character, no complaint seems to be made. The Government of the United States was bound alike by treaty stipulations, by the law of nations, and by national honor, to recognize and respect all just rights of property, although depending on inchoate grants. Why, then, does not the objection extend to the statute *in toto* ? The true reason is to be found in the obvious fact that it does not confiscate private property, or invade private rights in any sense.

By the Court, CURREY, J.

This is an action of ejectment brought to recover the possession of a specific part of the "Encinal of San Antonio," which is a portion of a larger tract of land called the "Rancho de San Antonio," situated in the County of Alameda. The plaintiff claims title to the demanded premises under Antonio Maria Peralta, one of the sons of Luis Peralta, deceased. The defendants claim title to five ninths of the same premises, derived by conveyances from the daughters and certain grandchildren of the same ancestor. Luis Peralta died in 1851, leaving him surviving four sons and four daughters, and the children of a deceased daughter, as his heirs at law.

After the cause was at issue upon the complaint and the answers first made and filed by the defendants, each of the defendants, by leave of the Court, amended his answer by adding thereto a further defense, alleging that the demanded premises was a part of the "Rancho de San Antonio," granted in or about the year 1820, by the Spanish Government to the said Luis Peralta, who died intestate in August, 1851, leaving him surviving children and grandchildren as his heirs at law; and that when he died he was seized in fee and possessed of the lands in controversy. That in 1852 the decedent's sons presented to the Board of Land Commissioners appointed under the Act of Congress of March 3, 1851, the title to said rancho for confirmation, and that the same was confirmed first by the Commissioners and afterward by the United States District Court, as good and valid. That these sons, in fraud of the rights of the other heirs, by the use of a simulated, false, and fraudulent document, purporting to be the last will and testament of the deceased, which was never proved nor admitted to probate, procured a confirmation of said rancho in parcels to themselves, and that the portion embracing the demanded premises was confirmed in the name of Antonio Maria Peralta. That the facts as to the means by which the confirmation was thus obtained were fully known to the plaintiff and his grantors at and before they or either of them acquired any claim or interest in the land. The amended answers also show that each of the defendants had

succeeded to whatever rights and interests the daughters and grandchildren of Luis Peralta had in the parcels of land of which the defendants respectively had the possession long before the action was commenced. And in conclusion they pray that plaintiff be compelled to release to the defendants respectively any right in the premises in controversy that he may wrongfully have acquired by the confirmation, and for general relief.

To the amended answers the plaintiff demurred on the grounds : First—That the same did not state facts sufficient to constitute a defense to the action, or to entitle them to relief in equity. Second—That it appeared by the amended answers that there were devisees and heirs at law of Luis Peraltâ who were indispensable parties, but who were not made parties thereto. Third—That more than three years had elapsed since the commission of the alleged fraudulent acts mentioned in the amended answers. Fourth—That more than four years had elapsed since the alleged cause of equitable relief accrued.

The Court sustained the demurrer, and the defendants excepted.

At the trial it appeared on the part of the plaintiff, that in 1852 Antonio Maria Peralta applied, under the Act of Congress passed on the third of March, 1851, entitled "An Act to ascertain and settle private land claims in the State of California," for the confirmation to him of a certain and specific part of the " Rancho de San Antonio," embracing the land in controversy ; and such proceedings were had concerning the matter that his claim thereto was finally confirmed by the proper authorities of the United States as a valid claim, and afterwards a survey was made of the land by the Surveyor-General of the United States for California, which was approved by the United States District Court.

After the plaintiff had produced further evidence in the case and had rested, the defendants, for the purpose of showing that the daughters of Luis Peralta, deceased, through whom they respectively claimed, had a perfect legal title to an undi-

vided share and interest in the demanded premises by descent cast, offered in evidence duly certified copies of certain documents which were in the archives of the office of the Surveyor-General of the United States for California, which are set forth in the transcript of the record in this case.   This documentary evidence is the same that was before the Supreme Court of the United States in the case of *The United States* v. *Peralta,* 19 How. 344, and is conceded to establish that the title of Luis Peralta to the Rancho de San Antonio was a grant in fee to a specific tract of land.

And the defendants further offered to prove that Don Luis Peralta, the grantee of the lands of " San Antonio," died intestate in the year 1851, seized of said lands, and that he left surviving him four sons and four daughters, and the children of a deceased daughter, all of whose names are mentioned ; and following this, the defendants offered in evidence deeds of conveyance duly acknowledged and recorded, by which they succeeded to all the right, title, and interest which the daughters and grandchildren of Luis Peralta acquired in and to the demanded premises upon the death of their ancestor.

The counsel for the plaintiff objected to the evidence so offered and to every part of it, and the objection was sustained by the Court.   To this ruling the defendants' counsel duly excepted.

In reviewing this case we shall first consider the question presented by the exception to the ruling of the Court in excluding the evidence offered on the part of the defendants. It is a question of great importance and of more than ordinary interest.   It involves a determination of the force and effect of a final confirmation and approved survey under the Act of Congress on the one hand, and the rights of those having perfect titles to lands in California when this territory was ceded by Mexico to the United States, who have omitted to submit them to be adjudicated upon, as indicated by the Act of Congress of 1851, on the other.

It is maintained on the part of the appellants that Luis Peralta acquired from the Government of Spain, while the

83

province of California belonged to that nation, a perfect title, or in the language of common law, a title in fee simple, to the "Ranhco de San Antonio," and that this title was subsisting and indefeasible when California was acquired by the United States; and the counsel for the respondent concedes the fact so to be, but contends, notwithstanding this, that the United States in its sovereign and governmental capacity had the right, in order to ascertain the extent and limits of its own lands, to require the owners of private land claims in this State, whether by perfect or imperfect titles, to present them for adjudication to the Commissioners and the Courts appointed for the purpose of passing upon their validity, and to declare, as a consequence of an omission to comply with this requirement within the time specified, that such lands "shall be deemed, held, and considered as part of the public domain of the United States."

At the time of the ratification of the treaty entered into between the United States and Mexico, by which the former nation acquired California, it must be presumed it was well known to the high contracting parties that portions of the ceded territory had become the property of individuals, and though it may not have been necessary under the circumstances of the acquisition to have provided by treaty stipulations for the protection of private property, still it was deemed but just to place the subject beyond the questioning of those who claim for conquering nations unlimited powers over and respecting the property of the citizens of the conquered country, and hence we may suppose the Mexican nation, with a deep solicitude for the welfare of its citizens who were then residents of the territories about to be ceded to the United States, proposed the VIIIth and IXth Articles of the treaty of Guadalupe Hidalgo, and that the justness of the provisions therein contained was freely acknowledged and agreed to on the part of the Government of the United States in the creation of this solemn compact.

The portion of the VIIIth Article of the treaty which par-

ticularly bears upon the question under consideration is as follows :

" Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican Republic, retaining the property which they possess in the said territories, or disposing thereof and removing the proceeds wherever they please without their being subjected on this account to any contribution, tax, or charge whatever."

By the IXth Article, the same care was manifested for securing the rights of Mexicans who might, in consequence of the transfer of the dominion and property of the territories about to be ceded, lose the character of citizens of the Mexican Republic before they were admitted "to the enjoyment of all the rights of citizens of the United States according to the principles of the Constitution." It was therefore stipulated that during the contemplated interval such Mexicans " shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

That it was intended by the treaty that Mexicans then established in California, and having property therein, should retain and enjoy it or dispose of it as to them might seem proper, the language of the treaty places beyond controversy.

Then, did the Congress of the United States intend, by the Act of March 3d, 1851, to compel persons of the class mentioned in the treaty, who at that time held lands in possession by perfect titles derived from the source of paramount proprietorship, to submit them to the Board of Commissioners appointed under that Act, or else to forfeit their lands to the Government?

In *Strother* v. *Lucas*, 12 Peters, 438, the Supreme Court of the United States said, that " in following the course of the law this Court has declared that even in cases of conquest the conqueror does no more than displace the sovereign and assume

dominion over the country." And in *Perchman's Case*, 7 Peters, 86, Mr. Chief Justice Marshall said: " A cession of territory is never understood to be a cession of the property of its inhabitants. The King cedes only that which belongs to him; lands he had previously granted were not his to cede. Neither party could so understand the treaty; neither party could consider itself as attempting a wrong to individuals condemned by the whole civilized world." And in *Strother* v. *Lucas*, Mr. Justice Baldwin said: " No construction of a treaty which would impair that security to private property which the laws and usages of nations would, without express stipulation, have conferred, would seem to be admissible further than its positive words require * * *. Without it, the titles of individuals would remain as valid under the new Government as they were under the old; and those titles, so far at least as they are consummate, might be asserted in the Courts of the United States, independently of the treaty stipulation." (12 Peters, 438; 7 Peters, 88; 9 Peters, 133 and 734.) Treaties, like the Constitution itself, are declared by that instrument to be the supreme law of the land. (Article VI.) The treaty of Guadalupe Hidalgo, as we have already seen, stipulates that Mexicans established in the territories then thereby ceded, might retain the property which they possessed, or dispose of it if they elected so to do; that they should be maintained and protected in the free enjoyment of their liberty and property without restriction.

The law deems every man to be in the legal seizin and possession of land to which he has a perfect and complete title; this seizin and possession is co-extensive with his right, and continues until he is ousted thereof by an actual adverse possession. This is a settled principle of the common law. (*United States* v. *Arredondo*, 6 Peters, 743; *Mitchel* v. *United States*, 9 Peters, 734.)

The cases of Arredondo and Perchman involved the construction of the treaty between Spain and the United States, by which Florida was ceded to the latter, relative to grants of land in the ceded territory, made by the King of Spain, or by

his lawful authorities therein, before the 24th of January, 1818. The treaty was drawn up in both the English and Spanish languages, and both of them were considered, in Perchman's case, as originals. The IId Article contained the cession of the territory, and the VIIIth, stipulations respecting the titles to lands in the territory ceded. The English part of the VIIIth Article was as follows: "All grants of land made before the 24th of January, 1818, by his Catholic Majesty, or by his lawful authorities in the said territory ceded by his Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of his Catholic Majesty." The Spanish part of this Article was the same as that in English, except the words "shall *be* ratified and confirmed" were "shall *remain* ratified and confirmed;" and Mr. Chief Justice Marshall, in speaking of this difference in language, said: "Although the words 'shall be ratified and confirmed' are properly the words of contract, stipulating for some future legislative act, they are not necessarily so. They may import that they shall be ratified and confirmed by the instrument itself."

In *Foster and Elam* v. *Nelson*, 2 Peters, 314, the Court considered the words, "shall be ratified and confirmed," as importing contracts, and in that case the same illustrious Judge said: "Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in Courts of justice as equivalent to an Act of the Legislature, wherever it operates of itself without the aid of any legislative provision. But when the terms of stipulation import a contract, where either of the parties engages to perform a particular act, the treaty addresses itself to the political not the judicial department; and the Legislature must execute the contract before it can become a rule of the Court." And he further said, had the Article declared that all the grants made by his Catholic Majesty before the 24th of January, 1818, shall be valid to the same extent as if the ceded territory had remained under his domin-

ion, it would have acted directly on the subject; and in *Perchman's Case*, 7 Pet. 89, he said if the circumstances of the difference of the language referred to between the English and Spanish parts of the treaty had been known in deciding *Foster and Elam* v. *Nelson*, he believed it would have produced the construction which was given to the VIIIth Article by the Court in *Perchman's Case*.

In *United States* v. *Wiggins*, 14 Pet. 349, Mr. Justice Catron said: " The object of the Court in the cases of Arredondo and Perchman was to exempt perfect titles from the operation of the VIIIth Article of the treaty under consideration in these cases, for the reason that they were perfect titles by the laws of Spain when the treaty was made ; and that when the soil and sovereignty of Florida were ceded by the IId Article, private rights of property were by implication protected ;" and he further said: " The Court, in its reasoning, most justly held that such was the rule by the laws of nations, even in case of conquest, and undoubtedly so in case of cession ; therefore, it would be an unnatural construction of the VIIIth Article to hold that perfect and complete titles at the date of the treaty should be subjected to investigation and confirmation by the Government ; and to reconcile the Article with the laws of nations, the Spanish side of the Article was referred to in aid of the meaning of the American side, when it was ascertained that the Spanish side was in the present tense ; whereupon the Court held that the implication resulting from the IId Article, being according to the laws of nations, that and the VIIIth Article were consistent, and must be so recognized by the United States in its Courts."    And further on he used this language : " That the perfect titles made by Spain before the 24th of January, 1818, within the ceded territory, are intrinsically valid and exempt from the provisions of the VIIIth Article, is the established doctrine of this Court, and that they need no sanction from the legislative or judicial departments of this country."

Where the claim of an individual to lands was of the nature of an inchoate or incomplete grant, which was of such

a character as to have bound the conscience of the former sovereign to perfect it, the United States, having acquired the territory, received it charged with the duty of carrying out in good faith the obligation of the former Government to its grantee, existing at the time of the cession.   The former Government never having parted with the title, and the United States having acquired the territory, with all the rights and obligations of the old Government, could, in its political capacity, prescribe the proceeding necessary to accomplish the duty which devolved upon it to invest the grantee with a perfect title; and hence the same political authority could impose such terms and conditions upon the claimant, for the speedy accomplishment of the end in view, as might be just to him and conducive to the public interests; and claimants under such grants could not complain if the Government upon which they depended for the perfection of their claims should provide a tribunal to examine their fairness, and should make their validity depend on their being submitted to such tribunal.   (*Henderson* v. *Poindexter*, 12 Wheat. 543 ; *McCulloch* v. *State of Maryland*, 4 Wheat. 409 ; *Hall* v. *Doe*, 19 Ala. 386.)   But the rule that applies to cases of inchoate titles can have no just application to titles that were already perfect and which stood confirmed by the treaty acting at the time of its creation, *eo instanti*, directly upon the subject.

It is argued by the counsel for the plaintiff that as the Constitution of the United States provides that " the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States," and as the sole power of providing for the primary disposition of the public lands devolves upon Congress, that therefore, in order to ascertain what is and what is not public land, Congress can exercise the means that may be necessary for such purpose, and that the Act of 1851 prescribed the means for the ascertaining not only who had the legal titles and merely equitable claims to lands, but thereby provided the mode by which the Government could ascertain the limits and extent of its own lands ; and he further argues

that " the Government which has a right to do an act, and has imposed upon it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means." (4 Wheaton, 409, 410.)   While the soundness of the doctrine urged is admitted, it could not be justly claimed that Congress could, in the proper exercise of its power, prescribe means imposing conditions which, if disregarded, would operate to divest the titles that were perfect and stood protected by compact beyond the repealing power of Congress.   By the common law, the King has no right of entry on lands which are not common to his subjects; the King is put to his inquest of office, or information of intrusion, in all cases where the subject is put to his action; their rights are the same, though the King has more convenient remedies in enforcing his.   If the King has no original right of possession to lands, he cannot acquire it without office found, so as to annex it to his domain. (3 Black. Com. 257, 258; Mitchel v. United States, 9 Peters, 742.)   If the King could not recover lands without an affirmative proceeding on his behalf, so as to annex them to his domain, who will say that the Congress of the United States intended, or could, if such was the intention, by conditions negative in their character, divest the owner in fee simple of lands of his title thereto, and transfer the same to the United States ?

That the citizen of the Mexican Republic who was seized in fee simple absolute of lands in California at the date of treaty, and who thereafter elected, according to its provisions, to become a citizen of the United States, could, if he chose to do so, have submitted his title and claim to such lands to be passed upon by the Commissioners and the proper Courts, under the Act of 1851, we have no doubt; but that he was bound to do so or lose his lands, we cannot believe was intended by the Act of Congress, nor do we conceive that a construction of the Act which would so result is authorized by its language or spirit.

The eighth section of the Act of 1851, it is true, provides that " each and every person claiming lands in California by

virtue of any right or title derived from the Spanish or Mexican Government, shall present the same to the said Commissioners when sitting as a Board," whose duty it shall be " to decide upon the validity of said claim." And the thirteenth section declares that " all lands the claims to which have been finally rejected by the Commissioners in manner herein provided, or which shall be finally decided to be valid by the District or Supreme Court, and all lands the claims to which shall not have been presented to the Commissioners within two years after the date of this Act, shall be deemed, held, and considered as part of the public domain of the United States."

The language of these sections seems sufficiently comprehensive to include titles and claims of all possible classes, and if these sections of the Act were to be interpreted without reference to other portions of it, or to the treaty or the law of nations affecting the subject, or could be considered independently of the principles of common right or right by the common law, we should not hesitate in coming to the conclusion that all titles and claims to lands, whether perfect or imperfect, were inexorably required to be presented to the Commissioners sitting as a Board, in order to save their forfeiture to the United States.

That Congress could select the means and prescribe the mode for perfecting just claims to lands that were imperfect and incomplete, in fulfilment of the Government's obligations, and could limit the holders of such claims to the means and mode provided, no one, we apprehend, for a moment would suggest a doubt. It may be observed that the many Acts that have been passed by Congress establishing Commissioners for the ascertainment and settlement of land claims in territories acquired by the United States by cession, have been passed for the benefit of persons whose claims to land were of that inchoate and incomplete character that required action on the part of the Government before they could become invested with the legal title thereto.

In *Henderson* v. *Poindexter*, 12 Wheat. 543, the Court considered the effect of certain Acts of Congress requiring per-

sons having claims to lands which needed confirmation to render them titles at law, to perform certain specified conditions within a time prescribed, that the Government might determine the question _ of their rights; and these Acts declared that in case of neglect to comply with the requirements enumerated therein such claims should become void and thereafter be forever barred. It will be seen, by reference to these Acts, that their object was twofold: first, to regulate grants of land in the ceded territory; and second, providing for the disposal of the lands of the United States in the same territory. The Chief Justice, in passing upon the case before the Court, first declared that the land claims which were confirmed as provided for in those Acts derived no validity from any other source than through the proceedings ordained by Congress, and then said: " The whole legislation on this subject requires that every title to lands in the country which had been occupied by Spain should be laid before the Board of Commissioners. The motives for this regulation are obvious; and as the titles had no intrinsic validity, it was opposed by no principle. Claimants could not complain if the law which gave validity to their claims should also provide a Board to examine their fairness, and should make the validity depend on their being laid before that Board."

In *Strother* v. *Lucas* both parties claimed under the same inchoate or incomplete title, and one of them had obtained under the Act of Congress a confirmation of his claim, while the other failed to present his to the Commissioners. In reference to his omission to present his claim to the Commissioners, Mr. Justice Baldwin said: " We find by various Acts the time of filing such claims is limited, after which they are declared void so far as they depend on any Act of Congress, and shall not be received in evidence in any Court against any person claiming by a grant from the United States. These," he said, "are laws analogous to Statutes of Limitations for recording deeds or giving effect to the awards of Commissioners for settling claims to land under the laws of the States;

the time and manner of their operations and the exceptions to them depend on the sound discretion of the Legislature, according to the nature of the titles, the situation of the country, and the emergency which calls for their enactment. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned. Cases may occur where the provisions of a law may be such as to call for the interposition of the Courts, but these under consideration do not."

The case of *Barry* v. *Gamble*, 3 How. 32, is similar to that of *Strother* v. *Lucas*, and the Court decided that the claim of the party who relied upon an incomplete foreign title became barred by neglecting compliance with the requirements of the Act of Congress to deliver to the proper officer by a given day and year a prescribed notice with the muniments of his right, to be recorded.

It will be seen by a careful examination of these authorities, and others of a like character, that the Court was dealing with imperfect titles. In one case they were said to have " no intrinsic validity," (12 Wheat. 543) and in others they were denominated "inchoate and incomplete; " and we have not been able to find a case, nor has the learned counsel for the plaintiff, than whom no one is more thorough is his researches, furnished us with one where the question was involved, in which it was held that a perfect title could become extinguished and its holder divested of his property by omitting to submit it for adjudication to a Board of Commissioners or to a Court appointed for the purpose. In *Clarke's Case*, 8 Peters, 444, in which it was said : " The grant which constitutes the foundation of the petitioner's claim is a complete title, subject . to no condition whatever," which had been presented to a Board of Commissioners, the Chief Justice, while approving of the Acts of Congress appointing Boards of Commissioners for the purpose of ascertaining and determining as to the validity of titles to lands, in order that there might be no conflict between these and those which might be acquired under the United States, said : "But neither the law of nations,

or the faith of the United States, would justify the Legislature in authorizing these Boards to annul pre-existing titles which might consequently be asserted in the ordinary Courts of the country against any grantee of the American Government."

It must be admitted that if a perfect title be required to undergo the ordeal of a Board of Commissioners, it might be declared invalid, notwithstanding it, before then, stood confirmed by the treaty; and hence it is that the Supreme Court of the United States, respecting the obligations of treaties and the binding force of law, as well as the rights of the citizen, have uniformly maintained that persons holding perfect titles to lands could not be deprived of their property otherwise than by due course of law; and to attribute to Congress the intention of imposing upon persons having perfect titles to lands in California at the date of the treaty, and who in due time became citizens of the United States, the necessity of submitting them to the Board of Land Commissioners to save their property from forfeiture to the United States, we should deem a grave charge, unsupported by a fair construction of the Act of 1851.

In addition to the provisions of the Act of 1851, to which we have already directly referred, we must, in the construction of the Act, consider all its provisions, and determine from it as a whole its meaning and intent. By the fifteenth section it is provided "that the final decrees rendered by the said Commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this Act, shall be conclusive between the United States and said claimants only, and shall not affect the interests of third persons."

If such only can be the effect of decrees and patents, and the interests of third persons are not to be affected thereby, then who are these third persons, and what is the character of the interests that stand unaffected? Third persons must be regarded to be all persons who were not parties to the proceeding before the Land Commission, or standing in any such relation with those who were parties thereto, as to

become affected and bound as privies; and the interests of third persons that remained unaffected by the final confirmation and patent are those subsisting in perfect titles derived from a source of paramount proprietorship, which could be used in resisting successfully any action of the Government respecting them. (*Waterman* v. *Smith*, 13 Cal. 419, 420; *Biddle Boggs* v. *Merced Mining Co.*, 14 Cal. 362; *Leese* v. *Clark*, 20 Cal. 425.) In the case last cited, Mr. Chief Justice Field said: "The acquisition of California by the United States did not affect the rights of the inhabitants to their property. The inhabitants retained all such rights, and were entitled by the law of nations to protection in them to the same extent as under the former Government." (*Teschemacher* v. *Thompson*, 18 Cal. 22.) And in respect to the "third persons" mentioned in the fifteenth section of the Act of 1851, he said: "The term 'third persons' refers not to all persons other than the United States and the claimants, but to those holding independent titles arising previous to the acquisition of the country. The latter class are not bound by the decree and patent, for they do not hold in subordination to the Government, nor by any title subsequent, but by title arising anterior to the conquest."

We are aware that the impression prevails to some extent that the same learned Judge, in *Estrada* v. *Murphy*, 19 Cal. 269, gave countenance to the idea that all land claims, whether resting on perfect or imperfect grants, had to be presented to the Commissioners in order to save such lands from passing to the United States; but we think such an impression is not justified by his opinion in that case, for he was then dealing with the question as involved in a case arising upon the failure of Estrada to present an imperfect or inchoate title to the Land Commission; and after having referred to the language of the Supreme Court of the United States in the cases of Fremont and Fossatt, suggested that doubts might exist as to the validity of the legislation of Congress, so far as it required the presentation to the Board of claims where the

lands were held by perfect titles acquired under the former Government.

It may, perhaps, be supposed that the observations of the Chief Justice in the case of *Fremont*, 17 How. 553, and of Mr. Justice Campbell in the case of *Fossatt*, 21 How. 447, are opposed to the views we have expressed as to the import and effect of the eighth and thirteenth sections of the Act of 1851. In the former case, the Chief Justice, after observing that the eighth section embraces not only inchoate or equitable titles, but legal titles also, and requires them all to undergo examination and to be passed upon by the Court, says: "The object of this provision appears to be to place the titles to lands in California upon a stable foundation, and to give to the parties who possess them an opportunity of placing them on the records of the country in a manner and form that will prevent future controversy." And in *Fossatt's Case*, in reference to the same subject, Mr. Justice Campbell says that the claims to be submitted to the inquiry and determination of the Board of Commissioners, it will be understood, comprehended all private claims to land in California, and that the effect of the inquiry and decision of these tribunals upon the matter submitted is final and conclusive, and referring to the Acts of Congress on the subject, he says : " These Acts of Congress do not create a voluntary jurisdiction that the claimant may seek or decline. All claims to land that are withheld from the Board of Commissioners during the legal term for presentation are treated as non-existent, and the land as belonging to the public domain."

It will be observed, by reference to the history of those cases, that both the claims of Fremont and Fossatt were of the class that required action on the part of the Government before they could become perfect and the land to which the claimants were respectively entitled could be segregated from the Government domain ; and the question that exists in the case under consideration was in nowise involved in the determination of those cases.

If the opinions thus expressed in the cases of Fremont and

Fossatt could be considered an authoritative construction of the Act of 1851, holding that lands belonging in fee to Mexican citizens at the date of the treaty became forfeited to the United States by reason of failure to present them for adjudication to the Board of Commissioners, we should acquiesce with that spirit of obedience which we freely acknowledge should actuate us in the presence of authority which we are not disposed to question.

It is true, as we have already observed, that the language of the eighth section of the Act is sufficiently comprehensive to embrace all classes of titles, and that titles not submitted to the judgment of the Commissioners should, by the thirteenth section, be deemed, held, and considered a part of the public domain; but, as we have seen, the fifteenth section provides that neither the final decrees rendered nor any patent issued shall conclude third persons or affect their interests. That the fifteenth section contemplated the existence of a class of persons and a quality of interests that could be conserved by its saving provisions, there can be no doubt; otherwise we would be inevitably impelled to the conclusion that this section was without design.

The Act of 1851 nowhere provides, as was the case by the Acts considered in *Henderson* v. *Poindexter*, and *Strother* v. *Lucas*, that by failing to present his claim to land to the Commissioners the possessor of the title should not be permitted to use it as evidence in an action for the maintenance of his right; and no other consequence for the omission is declared by the thirteenth section than that the land shall be deemed, held, and considered as part of the public domain. If it were necessary to construe this provision as working an annulment of a perfect title, we should be compelled to hold it to be repugnant to the stipulations of the treaty, which are of paramount obligation; and we believe it would be so held by the Supreme Court of the United States, if directly presented to that tribunal.

The decisions to which we have referred, and to which others might be added, we regard as declaring principles and

rules of law which constrain us to hold that perfect titles to lands which existed at the date of the treaty of Guadalupe Hidalgo in Mexicans then established in California, were guaranteed and secured to such persons, not only by the law of nations, but also by the stipulations of that treaty acting directly on the subject and operating as a confirmation *in presenti* of such title.

We think the original and amended answers filed by each of the defendants constituted a defense to the action of the plaintiff, and that the Court erred in sustaining the demurrer to the amended answers, and, also, in refusing to admit the evidence offered by the defendants in their defense; and that the judgment should be reversed and the cause remanded for a new trial.

There are other points presented by the record as grounds on which the defendants ask this Court to reverse the judgment, respecting which it is not necessary to say more than that the ruling of the Court on such points was correct.

The judgment is reversed and the cause remanded for a new trial.