No. 2,178.

THOMAS C. BANKS, RESPONDENT *v.* MIGUEL MORENO, CHARLES
MINTURN AND EDWARD MINTURN, APPELLANTS.

OPINIONS OF COURTS.—DICTA.—In construing judicial decisions, that only is
held to be authoritatively decided which was necessarily involved in the decision
of the cause.

MEXICAN GRANTS.—DESCRIPTION OF THE LAND.—To constitute a complete and
perfect grant to a specific parcel of land, it must, in some method, appear on
the face of the instrument, or by the aid of its descriptive portions, not only
that a specific parcel was intended to be granted, but it must also be so described
that the particular tract, intended to be granted, can be identified with reason-
able certainty.

IDEM.—Where there is nothing in the grant, nor in any of the documents to which
it refers, by which to fix the lines of one of the sides of the tract intended to be
granted, or to determine the particular quantity, the concession does not confer
upon the grantee a perfect title to any specific parcel of land.

The case of *Minturn* v. *Brower* (24 Cal. 644) and *United States* v. *Peralta* (19 How.
340), commented on and explained.

APPEAL from the District Court of the Third District,
Alameda County.

The case is stated in the opinion.

*Williams & Thornton,* for Appellants.

*First*—The papers given in evidence by the plaintiff con-
tain no feature of a perfect title. In none of them, prior to
February, 1844, is any mention made, either of an eastern
or western boundary.

*Second*—It is not pretended that these lands were ever
surveyed under the former Government, or in any manner
measured. Some such proceeding was necessary to segre-
gate them from the public domain and assign specific
boundaries. (*Yontz* v. *United States,* 23 Howard, 498; *United
States* v. *Pacheco,* 22 Howard, 226; *United States* v. *Billings,*
2 Wallace, 448; *Steinbach* v. *Moore,* 30 Cal. 508; *Arguello*
v. *Greer,* 26 Cal. 628; *Stevenson* v. *Bennett,* 35 Cal. 429;
*Leese* v. *Clark,* 18 Cal. 574; *Rodriguez* v. *Comstock,* 24 Cal. ·
87; *Greer* v. *Mezes,* 24 Howard, 274.)

*Third*—The unsigned document which concludes the
Micheltorreno Expediente, called the "*Vista la Peticion,*"
does not, for many reasons, compose a perfect title. It is

incomplete in itself. It is only, under the Mexican law and custom, an intermediate step towards the completion of the title. It is not signed by the Governor. It contemplates further action on the part of the Government. It is an order that a grant be issued, recorded and presented to the Departmental Assembly for approval. It is not the grant itself; it is but the usual form, under the colonization laws, by which the Government "*acceded*" to the request of the petitioner, and has never been held, *even when signed*, to confer more than an equity. It "has none of the characteristics of a definitive grant. It shows only that the Governor assents that the petitioner shall have a grant of a tract of land called San Antonio." (*Arguello* v. *United States*, 18 Howard, 542; *United States* v. *Peralta*, 19 Howard, 346.)

We regard the expression of the opinion of the Supreme Court of the United States in the case reported in 19 Howard, 340, as a mere *dictum*, and so the Court seems to have considered it.

In *Minturn* v. *Brower* (24 Cal. 644), this Court did not decide that the Peralta title was perfect. It did not even pretend to investigate the character of the title. (*Stevenson* v. *Bennett*, 35 Cal. 431.)

The whole decision is based upon the admission of counsel that the title was perfect.

*W. H. Patterson* and *H. K. W. Clark*, for Respondent.

The grant, or grants, to Peralta vested in him a perfect title. A title by grant, to be perfect, must be a tract by name or boundaries. (*United States* v. *Higueras*, 5 Wallace, 833.)

"Concessions or grants of land by Mexican Governors were of three kinds. * * * They were concessions or grants by specific boundaries, where, of course, the donor is entitled to the entire tract or concession * * or grant * * or grants, or concessions of a certain place or rancho by some *particular name*, either with or without specific boundaries, where the *donee* is entitled to the tract according *to the boundaries, if boundaries are given*, and if not, accord-

ing to the extent and limits of the tract or rancho, as shown by the proofs of settlement and possession."

Turning to the testimony of Stratton, it *cannot be disputed* but that this was a grant by name and by *specific boundaries;* in other words, the whole title *passed* from the Government and vested in Peralta. Nothing remained to be ceded to the United States by Mexico. It was protected by the treaty, *and the title* had vested in the daughters as well as the sons, on the death of Luis Peralta, in 1851, before the organization of the Land Commission, and no Act could be passed by Congress which could require any proceedings on the part of Peralta or his *children,* to be declared by the United States owners of that which Mexico had absolutely ceded, and which the treaty provided should be protected.

Protected how? Not by being compelled to appear in the Federal tribunals, to pay clerks' and commissioners' fees, to pay for a survey, to employ counsel at an enormous expense to follow the United States through the Land Commission, the United States District Court, the Supreme Court, and the Surveyor General's office, to be told, as the result, this was a perfect grant, but all these proceedings (almost amounting to confiscation) have been necessary to determine, not what Peralta owned at the date of the treaty, but what the United States acquired by virtue of that treaty.

If this is *protection,* within the meaning of the treaty, it is "such protection as the wolf gives to the lamb."

CROCKETT, J., delivered the opinion of the Court:

The premises in controversy are included in the "Rancho de San Antonio," which was granted by the Spanish, and afterwards by the Mexican Government, to Luis Peralta, now deceased. That portion of said rancho which includes the demanded premises has been finally confirmed to Antonio Maria Peralta, one of the sons of said Luis; and it was admitted on the trial that the defendants have all the title of the said Antonio and of the other sons of said Luis, and that the plaintiff has all the title of the daughters of said Luis, except one eighty-first part thereof. The title of the

entire rancho having been finally confirmed to the sons of the deceased Peralta, in severalty, and the claim of the daughters not having been presented to the Land Commissioner for confirmation, and not having been in any manner confirmed by the authorities of the United States, it is claimed on the part of the defendants that the daughters are estopped by the confirmation to the sons; and that, under the Act of March 3, 1851, organizing the Land Commission, the land became and must be deemed a part of the public domain of the United States, as against the daughters, who failed to present their claim for confirmation. In reply to this proposition the plaintiff claims that the title which Luis Peralta acquired from Spain and Mexico, was a complete and perfect title, conveying the fee, and which, under the law of nations and the treaty of Guadalupe Hidalgo, was not required to be presented for confirmation, and that if the Act of March 3, 1851, should be construed as including perfect titles, it would, to that extent, be void, as repugnant to the treaty and in violation of the vested rights of Peralta, which are protected by the law of nations. It is, therefore, claimed that, on the death of Luis Peralta, his title descended to his heirs at law, the four sons and five daughters, and that the title of the daughters remains wholly unaffected by their failure to present their claim for confirmation, and by the confirmation to the sons. The first point, therefore, for our examination is, whether or not the title acquired by the deceased, Peralta, from Spain and Mexico was a complete grant in fee, which needed no action on the part of the United States to perfect it into an absolute and perfect title in fee, or whether it was only an inchoate, equitable title, which the Government of the United States was bound in good faith to consummate by a conveyance of the legal estate. On behalf of the plaintiff, it is insisted that this is no longer an open question in this Court, and that it has been directly adjudicated in the case of *Minturn* v. *Brower* (24 Cal. 644), in which, it is said, this precise question arose and was decided in respect to a parcel of land immediately contiguous to the land in contest in this action. But, after a careful examination of that case, we think it is obvious the

question was not decided whether the title of Peralta was a perfect or only an inchoate title.    There was no occasion to decide it, inasmuch as it was conceded by counsel that Peralta held a perfect title, and in deciding the case the Court acted upon this as one of the admitted facts.    In delivering the opinion of the Court, Mr. Justice Curry says: "It is maintained on the part of the appellants that Luis Peralta acquired from the Government of Spain, while the province of California belonged to that nation, a perfect title, or, in the language of common law, a title in fee simple to the Rancho de San Antonio, and that this title was subsisting and indefeasible when California was acquired by the United States, *and the counsel for the respondent concedes the facts to be so,* but contends," etc.    It is too plain for argument that the Court was not called upon to decide, and did not attempt to decide, whether or not Peralta had a perfect title.    The fact was conceded by counsel, and, therefore, was not open for adjudication.

In *Stevenson* v. *Bennett* (35 Cal. 431), in commenting on *Minturn* v. *Brower*, we say : "But as to what would be regarded as a perfect title nothing was said directly, for the reason that the question was not involved in the case."    We are still of the same opinion.    The fact being admitted that Peralta held a perfect title, the Court had no authority to investigate it, and did not attempt to decide it.    It simply treated it as a conceded fact.

It is further claimed, that the question has been directly adjudicated by the Supreme Court of the United States in the case of *The United States* v. *Peralta* (19 How. 340) — in which case the claim of the sons of Peralta for confirmation of their title to said rancho was before that Court on appeal. In delivering the opinion of the Court, Mr. Justice Grier said : "The grant by Sola of a portion of the tract, of which Peralta had been originally put in possession, is a complete grant in fee of that portion ; " and the plaintiff claims that the premises in controversy are included within that portion granted by Sola, and of which Peralta had been originally put in possession.    Hence, it is insisted that this is an authoritative decision, directly on the point, that Peralta

had "a complete grant in fee" of these particular premises; and we infer that the District Court so interpreted it. But in that case a confirmation was sought by the sons, not only of the title derived from Governor Sola, but also under a grant of a part of the tract from Governor Arguello, and under a subsequent alleged grant of the whole by Governor Micheltorreno. It is evident in the case that, whether the grant from Sola was a complete grant in fee, or only the grant of an inchoate title, the title of Peralta—founded not only in that, but also upon the subsequent grants from Arguello and Micheltorreno, and accompanied by a continuous possession, commencing as early as the year 1820—ought to be confirmed. It is evident the Supreme Court took that view of the case, and deemed it wholly immaterial whether the grant by Sola conveyed a perfect or only an inchoate title; because, immediately following the paragraph we have quoted, the opinion proceeds to say: "But it is of little importance to the decision of the case whether it conferred only an inchoate or equitable title, connected with an undisputed possession of thirty years, and confirmed again in 1844 by the order of the Governor of California—its claim for protection, under the treaty with Mexico, cannot be doubted, notwithstanding its want of confirmation by the Departmental Assembly." The declaration, therefore, that the grant by Sola was a complete grant in fee, was the statement of a proposition not necessary to the adjudication of the case, and not essential to the rights of the claimants; and the result would have been the same if that proposition had been wholly omitted from the decision, or even if it had been reversed and the Court had held that the title derived under the grant from Sola was only an inchoate, equitable title, and not a grant in fee. The statement of the proposition, therefore, must be regarded only as the *dictum* of the Judge who wrote the opinion, and not as an adjudication of the Court. It is well settled that, in construing judicial decisions, only that is held to have been authoritatively decided which was necessarily involved in the decision of the cause; and, whilst yielding a cheerful acquiescence in the decisions of the Supreme Court of the United States upon

matters within its jurisdiction, we do not consider that we are bound by every isolated expression which may fall from the Judge who delivered the opinion on points not necessarily involved in the adjudication of the cause. The clause quoted from the opinion of Mr. Justice Grier is of that character, and however great our respect for the author of the opinion as a learned jurist, we do not accord to this expression in his opinion the force of an authoritative decision by the Court. We are convinced the Court which decided the cause would not consider itself as bound by this paragraph in the opinion of the learned Justice; and it is evident, from the whole decision, that little or no weight was attached by the Court to this clause of it. We do not, therefore, consider that the point was decided by the Court, as claimed by the counsel for the plaintiff, and shall proceed to discuss the question at issue as an original proposition not heretofore decided either by this Court or the Supreme Court of the United States.

The precise point under discussion is, whether or not the title of Peralta, as exhibited by the plaintiff, was a perfect title conveying the fee, and which invested him with absolute dominion over a specific parcel of land, without any further action on the part of the United States; or whether, at the time of the cession of California, something remained to be done by the Government which was necessary to invest Peralta with a complete legal title to the specific tract.

In every complete grant conveying a perfect title it is essential that the thing granted be sufficiently described to enable it to be identified. In grants of real estate it is not always necessary to describe it by metes and bounds, or by · a reference to actual or artificial monuments, nor by courses and distances. If the tract granted have a well known name, and the boundaries of the tract known by that name are notorious and well defined, a grant of the tract by its name would, doubtless, convey the title to the whole. In like manner, a grant describing the tract by reference to the known occupation of the grantor or another—or to another instrument containing a sufficient description of the premises—would be sufficient. In short, any description will

suffice which identifies the land granted with such certainty that the specific parcel intended to be granted can be ascertained either by the calls of the instrument, as applied to the land, or by aid of the descriptive portions of the grant. These are familiar propositions, too well known to the profession to need the citation of authorities. But it is equally certain that to constitute a complete and perfect grant to a specific parcel of land, it must, in some method, appear on the face of the instrument, or by the aid of its descriptive portions — not only that a specific parcel was intended to be granted, but it must also be so described that the particular tract intended to be granted can be identified with reasonable certainty. It would be a contradiction in terms to say that a specific tract was granted, if there was nothing in the grant by which it could be ascertained with reasonable certainty what particular parcel was intended to be conveyed.

In applying these principles to the grant to Peralta, we will first consider the grant from Governor Sola. In his petition for the grant, Peralta does not designate the land by any name, nor by reference to his occupation of it, nor by referring to any other document, nor even by quantity. The only description is that, at the distance of eight leagues northerly or northwesterly along the coast from the Mission of San José, there is a creek called San Leandro; "and from this to a little hill adjoining the sea beach in the same direction, and along the coast — there *may be four or five leagues*, more or less, or about — which place and land he asks and solicits," etc. If it be conceded that from this description it must be assumed, that the land was to front upon the bay from the San Leandro creek to "the little hill adjoining the sea beach" — and if it be further conceded that the northerly line would necessarily be a line running easterly at right angles from the "little hill," or parallel with the general course of the San Leandro creek — we should thus have three of the boundary lines, to wit: the creek on the south, the bay on the west and a line running easterly from the "little hill" on the north. But how was the eastern line to be ascertained? Not by quantity; because he asks for no particular quantity, unless the statement that between the

creek and the little hill "there may be four or five leagues, more or less, or about," can be deemed a designation of quantity. He evidently asked for a tract of which the San Leandro creek was to be the southern boundary, and a line running easterly from the little hill was to be the northern boundary, and he intended to say in his petition either that the distance from the creek to the little hill was four or five leagues, or that between those points there might be four or five square leagues of land, "more or less, or about." We will assume, as more favorable to the plaintiff, that it was the latter, and that he asked for these four or five leagues, "more or less, or about." This would furnish no basis whatever for locating the eastern line, for the reason that the quantity was wholly uncertain. There is nothing in the petition by which it would be possible to fix this line, or to determine the particular quantity of land which he solicits. The document issued by Governor Sola, under date of August 3, 1820, is equally vague. He simply instructs Captain Arguello to appoint one of his subordinates to place Peralta "in possession of the lands petitioned for," and to "place landmarks on the four points of the compass, that it may be known at all times the extent of said lands which have been granted to him." There is no description whatever of the land except by reference to the petition. Nor does the return of Martinez to this decree for the delivery of possession remove the uncertainty. He says that the boundaries, which he designated on the ground, were the "deep creek, called San Leandro; and at a distance from this (say about five leagues) there are two small mountains *(cerritos);* the first is close to the beach; next to it follows that of San Antonio, serving as boundaries to the rivulet which issues from the mountain ranges and runs along the foot of said small mountain of San Antonio, dividing or separating the lands; and at the entrance of the little gulch there is a rock elevating itself in the form of a monument and looking toward the north; on *both* boundaries were fixed firm landmarks." All that can be deduced from this is, that he established the San Leandro creek as the southern       , and the rivulet

running down from the mountains by the foot of the small mountain of San Antonio as the northern boundary, and that at the entrance of the little gulch (through which the rivulet flowed, as we infer) there was a rock in the form of a monument. He does not pretend to have established the eastern line, or to have placed monuments except on the northern and southern lines, and is wholly silent as to quantity. The eastern line was left as indefinite as it was before, and the quantity of land granted was in no manner defined, either in the grant or in the act of possession. If it be claimed that the monumental rock in the gulch must be assumed as the extreme easterly end of the northern line, and that a straight line from thence southerly to the San Leandro creek would give the boundary on the east, the answer to this proposition is, that there is nothing whatever in the return of Martinez, who delivered the possession, to indicate that this rock was intended to designate the eastern terminus of the northern line. On the contrary, it was *obviously intended only to identify the gulch through which,* as we infer, the rivulet flowed. But if the rock itself was intended as a monument to mark the boundary, there is nothing whatever to indicate that the northern line was to terminate at the rock.

The second decree of the Governor, by which he removed the northern line further south, and the act of possession under it, do not help the matter. By these the northern line was fixed at "a rivulet issuing from the mountain or hill range, which runs down to the beach, where is a little forest of willows (willow grove), fixing in said place the four landmarks, which shall be valid, and not those which were designated before on the little mountain of San Antonio." Nothing is said of the eastern line, nor of the quantity. This brings us to the "certifying document" or *vista la peti-cion* issued by Governor Sola in October, 1822, in which he describes the boundary fixed by Martinez on the north as "about one and half leagues from the small hill of San Antonio, towards the part of San Leandro, serving as a dividing place, a small brook which falls from the mountains or heights running towards the beach, where ends a willow

brake, establishing on said land the four landmarks."
Nothing is said of the other boundaries, nor of the quantity
of land granted, unless what may be inferred from a refer-
ence in the first clause of the instrument to the petition of
Peralta for the grant.   As we have already seen, a reference
to that petition cannot aid the uncertainty as to the quantity
granted or the location of the eastern line.

Our conclusion is, that from each and all of these docu-
ments there was a total uncertainty, not only as to the quan-
tity granted, but as to the eastern boundary of the tract.
Nor was this uncertainty in any degree removed by the
decree of Governor Arguello, of June 30, 1823, which simply
restores the northern boundary as at first fixed by Martinez,
at the little hill of San Antonio, but does not attempt to
establish any other boundaries, nor to define the quantity
granted.   It may be said that we will take judicial notice of
the prominent topographical features of the country, and
consequently that we must judicially know that opposite
this portion of the bay the hills approach the water so nearly
as to leave but a comparatively narrow strip of valley land
between the bay and the foothills, and that the inference is
that the Governor intended to grant to Peralta all the land
lying between the northern and southern boundaries and the
bay on the west and the mountains on the east.   But no
such inference can be drawn from the documents on which
we have commented.   It would be a forced and unnatural
interpretation of them to hold that it was intended to grant
only valley lands, or all the valley lands, without reference to
quantity, lying between the northern and southern boundaries.
On what theory could we limit the grant to valley lands?   Why
not include the foothills or the mountain sides, or the sum-
mits of the adjacent mountains?   On the face of these papers,
and with the most accurate knowledge of the topography of
the country, it would be wholly impossible for any Court or
surveyor to locate the eastern line, or define the quantity of
land granted.   On the trial, Mr. Stratton, a surveyor and a
witness for the plaintiff, was asked if he knew the San Anto-
nio creek, the *cerrito* of San Antonio, and a rivulet that runs
from the foot of the *cerrito* de San Antonio to the Sugar-

loaf rock. He replied that he knew these objects, and added: "I know the boundaries of this ranch." He was then asked: "Are they natural and well defined boundaries, unmistakable as described in the grant?" To which he replied: "Yes, sir." This was the only oral testimony on the point; and it does not appear from the record what grant or papers, if any, were shown to the witness, nor to what grant to Peralta he referred, if to any. He may and doubtless did refer to the grant of Micheltorreno, and not to the grant by Sola, if he had reference to any grant. But in testifying that the boundaries of the *"ranch"* are natural and well defined, there can be no inference from this that he had the slightest reference to the grant by Sola which we are now considering. On the whole, our conclusion is that the documents we have described did not confer upon Peralta a perfect title to any specific parcel of land.

It is not necessary for us to decide whether or not such a grant would be void for uncertainty in the description. Accompanied by a long possession, acquiesced in by the Mexican authorities, it would doubtless be sufficient to establish an equity, which was entitled to protection under the treaty. But it was the province of the Government to define the boundaries of the tract, and to segregate the land from the public domain; in performing which duty it would find no difficulty in ascertaining the northern, southern and western boundaries; and in defining the eastern line it would be governed, doubtless, in a great measure, by the notorious occupancy and dominion of the claimant, exercised under·a claim of title, and acquiesced in for so many years by the Mexican authorities. But without this act of segregation it would have been impossible for the claimant to have known to what precise parcel of land he was entitled, or for the Government to have ascertained what particular line separated it from the public domain. It was, therefore, necessary, both to the claimant and to the Government, that this segregation should be had.

We do not understand the counsel to claim that the grant by Micheltorreno made the title perfect, if it was not so

before. If, however, it be so claimed, the proposition is not tenable for many reasons :

*First*—The petition of Ignacio Peralta, on behalf of his father, to the Governor, asks for "a new title" to his father; and, doubtless, remembering the vague description of the land in the grant by Sola, he seeks to remedy the difficulty by requesting that the new grant include "the range of this up to its summit, and thence to the sea." The view is confirmed by the report of Jimeno on the petition, who acquiesces in the propriety of "granting him a *new* title;" but recommends that, "in fixing the boundaries to the tops of the mountains, it will be convenient that it be under the condition not to prevent the neighbors on the Contra Costa from cutting wood," etc. He, evidently, did not understand that the prior grant from Sola fixed that boundary at the tops of the mountains; otherwise, the presumption is, the same boundary would have been fixed in the new grant, without conditions.

*Second*—In the order or decree of the Governor, indorsed on the petition, and acceding to the grant, he requires the usual condition accompanying a grant under the colonization law, to wit : "the citation of the neighbors before the possession," and, he adds, "in order to avoid subsequent reclamations." What reclamations could there be if the same land had already been granted by Sola, so as to convey a perfect title?

*Third*—The last document which was put in evidence, bearing date February 13, 1844, is only the usual *vista la peticion*, and does not purport to be a final grant. It concludes with these words : "Let the proper warrant (voucher) be issued, enter the same in the respective book, and let this expediente be transmitted to the Excellent Departmental Assembly for their approval."

This decree was not signed by the Governor, and it was not usual to sign such decree, inasmuch as the final, formal grant, the "*titulo*," was afterwards to issue. It has always been regarded in the Courts but as one of the intermediate steps preceding the final grant, and not as translative of the legal title. (*Arguello* v. *United States*, 18 How. 542.) This

very document was so treated by the Supreme Court of the United States, when the claim was before that Court for confirmation. (*United States* v. *Peralta,* 19 How. 346.) In our opinion, therefore, the grant by Micheltorreno created only an inchoate, and not a perfect title. It results from these views that Peralta, at the time of his death, had not a perfect, but only an inchoate, title to the land in contest, and it required the action of the United States authorities to convert the equitable into a complete legal title.

If this be so, it cannot be doubted, and we understand the counsel for the plaintiff in that event to concede, that the proof of final confirmation to Antonio Maria Peralta, offered by the defendants, was competent evidence, and ought to have been admitted. If admitted, it would have shown a valid, final confirmation to said Antonio Maria, and an official survey under it, including the premises in controversy; and the title so confirmed would have vested in the confirmee for his own use, and to the use of those deriving title under him, to the exclusion of the sisters, under whom the plaintiff claims. (*Estrada* v. *Murphy,* 19 Cal. 248; *Rico* v. *Spence,* 21 Cal. 504.)

This view of the case renders it unnecessary for us to decide the other questions raised on this appeal.

Judgment reversed and cause remanded for a new trial.

WALLACE, J., being disqualified, did not participate in the decision of this cause.