## BOTILLER v. DOMINGUEZ.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 1370. Submitted January 7, 1889. — Decided April 1, 1889.

If an act of Congress is in conflict with a treaty of the United States
with a Foreign Power, this court is bound to follow the statutory enact-
ments of its own government.

No title to land in California, dependent upon Spanish or Mexican grants,
can be of any validity, which has not been submitted to, and confirmed
by, the board provided for that purpose under the act of March 3, 1851,
9 Stat. 631; or, if rejected by that board, confirmed by the District Court
or by the Supreme Court of the United States.

THE case which raised the federal question was stated by
the court in its opinion as follows:

This is a writ of error to the Supreme Court of the State of
California.

The action was in the nature of ejectment, brought in the
Superior Court of the county of Los Angeles by Dominga
Dominguez against Brigido Botiller and others, to recover
possession of a tract of land situated in said county, known as
Rancho Las Virgenes. The title of the plaintiff was a grant,
claimed to have been made by the government of Mexico to
Nemecio Dominguez and Domingo Carrillo on the first day of
October, 1834; but no claim under this grant had ever been
presented for confirmation to the board of land commissioners
appointed under the act of Congress of March 3, 1851, 9 Stat.
631, "to ascertain and settle the private land claims in the
State of California," and no patent had ever issued from the
United States to any one for the land or for any part of it.

It appeared that the defendants, Botiller and others, prior
to the commencement of the action, had settled upon and
severally were in the occupancy of the respective parcels or
tracts of land claimed by them, and had improved and culti-
vated the same, and were in the possession thereof, with the pur-

pose and intention of holding and improving the several tracts of land so severally held, as preëmption or homestead settlers, claiming the same to be public lands of the United States. It was shown that they were competent and proper persons to make preëmptions or homestead claims, and that the land in controversy was within the territorial limits of the so-called Rancho Las Virgenes.

On this state of facts the judge of the inferior court. instructed the jury as follows:

"First. It is made my duty to construe the written instruments received in evidence in this case and to declare their legal effect. I therefore instruct you that the documents, Plaintiff's Exhibits A and B, and the acts evidenced thereby under the Mexican law in force at the time they were made, constituted a perfect grant and operated to vest in the grantees therein named all the right, title and interest of the Mexican government. They vested as much title under the laws of Mexico in the grantee as does a patent from the United States to the patentee under our system of government.

"Second. The title to the land by grant from Mexico, being perfect at the time of the acquisition of California by the United States, the grantee was not compelled to submit the same for confirmation to the board of commissioners established by the act of Congress of March 3d, 1851, nor did the grantee, Nemecio Dominguez, forfeit the land described in the grant by a failure to present his claim for confirmation before said board of commissioners, and the title so acquired by the grantee may be asserted by him or his successor in interest in the courts of this country."

To this ruling and instruction the defendants excepted. Judgment was rendered for plaintiff, which was affirmed by the Supreme Court of the State of California, and to that judgment this writ of error is directed.

*Mr. J. M. Gitchell* for plaintiffs in error.

*Mr. A. L. Rhodes* for defendant in error.

The grant of the rancho constituted a perfect Mexican title, and was not required to be presented to the board of commis-

sioners under the act of 1851. This proposition would seem to be fully settled in the Supreme Court of the State in *Minturn* v. *Brower*, 24 Cal. 644. The decision in that case is mentioned with approval in *Stevenson* v. *Bennett*, 35 Cal. 424, 431; *Steinbach* v. *Moore*, 30 Cal. 499, 507; *Seale* v. *Ford*, 29 Cal. 104, 107; *Banks* v. *Moreno*, 39 Cal. 233, 237.

The case of *Minturn* v. *Brower* was very carefully, thoroughly and elaborately considered by the court; and the doctrine there laid down that it was not the intent of the act of March 3d, 1851, for the settlement of private land claims in California, to require persons holding perfect titles to lands in California to present them to the land commission provided for by that act for confirmation; and that the holders of such titles could not be required to present them for confirmation, under the penalty of forfeiture of their titles for failure so to present them, would seem to be sustainable upon well-recognized principles of constitutional law. Those principles have often been stated by this court in cases involving questions of title derived from foreign governments; and have sometimes been applied by the court to cases presenting features similar to those in this case. We will hereafter refer to some of those cases.

We think that there would never have been any doubt upon this question, were it not for certain dicta in *Fremont* v. *United States*, 17 How. 542; *United States* v. *Fossatt*, 21 How. 445; and *More* v. *Steinbach*, 127 U. S. 70, to the effect that the act of 1851 required the holders of all titles derived from the Spanish or Mexican Governments, whether perfect or imperfect, to present them to the land commission for confirmation; that the requirement of the act extended not only to the holders of equitable, inchoate or imperfect titles, but also to the holders of perfect titles.

This court in *United States* v. *Moreno*, 1 Wall. 400, and *Beard* v. *Federy*, 3 Wall. 478, and the Supreme Court of the State in *Estrada* v. *Murphy*, 19 Cal. 248, carefully save perfect titles from the construction given in those cases to the act of 1851, holding only that the act required the presentation to the land commission, of imperfect titles — such titles as were involved in those cases.

The treaty of Guadalupe Hidalgo preserved the rights of property then held by Mexican citizens in the ceded territory. This placed them on the same footing as citizens of the United States. See *United States* v. *Percheman*, 7 Pet. 51; *United States* v. *Clarke*, 8 Pet. 436, 465; *United States* v. *Wiggins*, 14 Pet. 334, 349; *United States* v. *Arredondo*, 6 Pet. 691; *Henderson* v. *Poindexter*, 12 Wheat. 530, 543; *United States* v. *Reynes*, 9 How. 127, 144; *Dent* v. *Emmeger*, 14 Wall. 308, as to titles under the cessions of Florida and Louisiana, where a like doctrine has been held.

Congress had no power, under the Constitution, to require the presentation of perfect titles to the board of land commissioners, under the penalty of forfeiture of the land.

This point was not presented in *Minturn* v. *Brower*, *ubi supra*, at least, not in the form now attempted. The State, upon its admission into the Union, succeeded — as was said of Alabama — to all the rights of sovereignty, jurisdiction and eminent domain. *Pollard* v. *Hagan*, 3 How. 212.

The State has all the powers pertaining to sovereignty, except as limited by the Constitution of the United States. All persons and property were subject to its dominion. It has authority to provide for the acquisition, tenure and transmission of titles to property. It regulates domestic relations, trusts, agencies and the like. It possesses the right of eminent domain, and all escheats vest in the State. The State has the ultimate jurisdiction over persons and things, except as limited by the Constitution of the United States. *New York* v. *Miller*, 11 Pet. 185.

The Colonization Law of 1824, and the Regulations of 1828, were, after their adoption, and until superseded by the treaty of cession, the only laws in force regarding the granting of public lands in California. *United States* v. *Vallejo*, 1 Black, 541; *United States* v. *Workman*, 1 Wall. 745; *United States* v. *Osio*, 23 How. 273.

Those laws provided the means for the acquisition of the *entire and perfect title* by the persons who should petition for grants of lands.

The court will take judicial notice of the laws of Mexico re-

lating to the granting of public lands. *United States* v. *Turner*, 11 How. 663; *Fremont* v. *United States*, 17 How. 542; *United States* v. *Perot*, 98 U. S. 428; *Payne* v. *Treadwell*, 16 Cal. 221. And they will take notice of those laws, as they would of a state law of California for the sale of the public lands of the State, and under which lands have been sold, but which was afterwards repealed, upon the adoption of a new law upon the same subject.

It must be remembered that the United States is and stands, in respect to its lands, as a private proprietor, except that it is not subject to state taxation, or the Statutes of Limitation, or the statutes regarding conveyances, and enjoys perhaps some other immunities. If Congress can forfeit our lands twenty years after our title became perfect, we cannot perceive why it cannot provide for another forfeiture twenty years after the issue of the patent under the act of 1851; that is to say, unless for some undiscovered reason, the title issued by the United States is better entitled to protection than one issued by the predecessor or grantor of the United States. It is said in *Fletcher* v. *Peck*, 6 Cranch, 87, that a State cannot annul her grant of lands. It is equally clear that she cannot annul a grant made by her predecessor. It is also clear that the United States cannot annul a grant, valid when made, whether made by the State or its predecessor. The claim of such a power is repugnant to the Constitution of the United States.

MR. JUSTICE MILLER delivered the opinion of the court.

The principal error assigned, and the only one necessary to be considered here, is in the following language:

"The court erred in holding that under the said act of Congress of March 3d, 1851, it was not necessary for each and every person claiming lands in California, by virtue of any right or title derived from the Spanish or Mexican governments, to present such claim to the board of land commissioners under said act."

The question presented is an important one in reference to land titles in the State of California, and is entitled to our

serious consideration. Although it has been generally sup-
posed that nearly all the private claims to any of the lands
acquired by the United States from Mexico, by the treaty of
peace made at the close of the Mexican war, have been pre-
sented to and passed upon by the board of commissioners
appointed for that purpose by the act of 1851, yet claims are now
often brought forward which have not been so passed upon by
that board, and were never presented to it for consideration.
And if the proposition on which the Supreme Court of Cali-
fornia decided this case is a sound one, namely, that the board
constituted under that act had no jurisdiction of, and could
not by their decree affect in any manner, a title which had
been perfected under the laws of the Mexican government
prior to the transfer of the country to the United States, it is
impossible to tell to what extent such claims of perfected titles
may be presented, even in cases where the property itself has
by somebody else been brought before that board and passed
upon.

The proposition seems to have been occasionally the subject
of comment in the Supreme Court of California in the early
days, after the land commission had ceased to exist, and it has
also been frequently considered in decisions of this court of
the same period. It is urged very forcibly by counsel for the
plaintiff in error that this court has fully decided against it in
several well considered cases, and that previous to the case of
*Minturn* v. *Brower*, 24 Cal. 644, the decisions, or at least the
intimations, of the Supreme Court of California were also
against the doctrine.

By the treaty of peace, known as that of Guadalupe Hidalgo,
of February 2, 1848, 9 Stat. 922, which closed the controversies
and the war between the United States and Mexico, a cession
was made of a very large territory by the government of
Mexico to the government of the United States. This was a
transfer of the political dominion and of the proprietary inter-
est in this land, but the government of Mexico caused to be
inserted in the instrument certain provisions intended for the
protection of private property owned by Mexicans within this
territory at the time the treaty was made; and it may be con-

ceded that the obligation of the United States to give such protection, both by this treaty and by the law of nations, was perfect.

That portion of this territory which afterwards became a part of the United States under the designation of the State of California had been taken possession of during the war, in the year 1846. Most of it was in a wild state of nature, with very few resident white persons, and very little land cultivated within its limits. Article 11 of the treaty describes it in the following language:

"Considering that a great part of the territories which, by the present treaty, are to be comprehended for the future within the limits of the United States, is now occupied by savage tribes, who will hereafter be under the exclusive control of the government of the United States, and whose incursions within the territory of Mexico would be prejudicial in the extreme, it is solemnly agreed that all such incursions shall be forcibly restrained by the government of the United States, whensoever this may be necessary."

This extract from the treaty shows the character of the country which was acquired by the United States under that instrument.

Very soon after the American army took possession of California in 1846, it was discovered that rich mines of the precious metals were abundant in that country, and a rush of emigration almost unparalleled in history to that region commenced, which was continued from that time on for many years. It was in this condition, as to population, of the territory itself, with a proprietary title in the United States to a vast region of country included within its limits, in which miners, ranchmen, settlers under the Mexican church authorities and claimants under Mexican grants were widely scattered, that the State of California was admitted into the Union, and the necessity was presented for ascertaining by some means the validity of the claims of private individuals within its boundaries, and to establish them as distinct from the lands which belonged to the government. To this end Congress passed a statute on the 3d day of March, 1851, en-

titled "An act to ascertain and settle the private land claims in the State of California." 9 Stat. 631. The first section of that statute reads as follows:.

"SEC. 1. That for the purpose of ascertaining and settling private land claims in the State of California, a commission shall be, and is hereby, constituted, which shall consist of three commissioners, to be appointed by the President of the United States, by and with the advice and consent of the Senate, which commission shall continue for three years from the date of this act, unless sooner discontinued by the President of the United States."

Several of the succeeding sections are devoted to providing for officers, declaring their duties, directing the mode of taking depositions and regulating the sessions of the commissioners, the administration of oaths, and other matters. The eighth section is as follows:

"SEC. 8. That each and every person claiming lands in California by virtue of *any right or title derived from the Spanish or Mexican government* shall present the same to the said commissioners when sitting as a board, together with such documentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims; and it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and, within thirty days after such decision is rendered, to certify the same, with the reasons on which it is founded, to the district attorney of the United States in and for the district in which such decision shall be rendered."

The ninth and tenth sections provide for appeals by the claimant and by the government from the decisions of this commission, first to the District Court of the United States within that district, and from thence to this court.

The eleventh section, prescribing the rule by which the commissioners shall decide these cases, is as follows:

"SEC. 11. That the commissioners herein provided for, and the District and Supreme Courts, in deciding on the validity

of any claim brought by them under the provisions of this act, shall be governed by the treaty of Guadalupe Hidalgo, the law of nations, the laws, usages and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable."

Section 13 declares:

" That all lands, the claims to which have been finally rejected by the commissioners in manner herein provided, or which shall be finally decided to be invalid by the District or Supreme Court, *and all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States;* and for all claims finally confirmed by the said commissioners, or by the said District or Supreme Court, a patent shall issue to the claimant upon his presenting to the general land office an authentic certificate of such confirmation, and a plat or survey of the said land, duly certified and approved by the surveyor general of California, whose duty it shall be to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same," etc.

" Sec. 15. That the final decrees rendered by the said commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

Two propositions under this statute are presented by counsel in support of the decision of the Supreme Court of California. The first of these is, that the statute itself is invalid, as being in conflict with the provisions of the treaty with Mexico, and violating the protection which was guaranteed by it to the property of Mexican citizens, owned by them at the date of the treaty; and also in conflict with the rights of property under the Constitution and laws of the United States, so far as it may affect titles perfected under Mexico. The second proposition is, that the statute was not intended to apply to claims which were supported by a complete and perfec title

from the Mexican government, but, on the contrary, only to such as were imperfect, inchoate and equitable in their character, without being a strict legal title.

With regard to the first of these propositions it may be said, that so far as the act of Congress is in conflict with the treaty with Mexico, that is a matter in which the court is bound to follow the statutory enactments of its own government. If the treaty was violated by this general statute enacted for the purpose of ascertaining the validity of claims derived from the Mexican government, it was a matter of international concern, which the two States must determine by treaty, or by such other means as enables one State to enforce upon another the obligations of a treaty. This court, in a class of cases like the present, has no power to set itself up as the instrumentality for enforcing the provisions of a treaty with a foreign nation which the government of the United States, as a sovereign power, chooses to disregard. *The Cherokee Tobacco*, 11 Wall. 616; *Taylor* v. *Morton*, 2 Curtis, 454; *Head Money Cases*, 112 U. S. 580, 598; *Whitney* v. *Robertson*, 124 U. S. 190, 195.

The more important question, however, is — does the statute, in its provisions for the establishment and ascertainment of private land claims in that country which was derived from Mexico, apply to such as were perfected according to the processes and laws of Mexico at the time the treaty was entered into? or is it limited to those imperfect and inchoate claims where the initiation of the proceedings necessary to secure a legal right and title to the property had been commenced but had not been completed?

There is nothing in the language of the statute to imply any such exclusion of perfected claims from the jurisdiction of the commission. The title of the act, so far as it can be relied on, repels any such distinction; it is "to ascertain and settle the private land claims in the State of California;" and the first section, above quoted, uses the same terms. "That for the purpose of ascertaining and settling private land claims in the State of California, a commission shall be, and is hereby, constituted," etc. The eighth section, which prescribes the functions of the court and its duties says: "That *each and every*

person claiming lands in California by virtue of *any right or title derived from the Spanish or Mexican government*, shall present the same to the said commissioners when sitting as a board, . . . and it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same," etc.

In all this there is no hint or attempt at any distinction, as to the claims to be presented, between those which are perfect and those which are imperfect in their character. On the contrary, the language of the eighth section is as precise and comprehensive as it could well be made, in that it includes every person claiming lands in California " by virtue of any right or title derived from the Spanish or Mexican government."

The fifteenth section declares that the final decrees rendered in such cases, or any patent issued under the act, " shall be conclusive between the United States and the said claimants only ; " that is to say, it shall be conclusive on the United States and on the claimants, but it shall not conclude the rights of anybody else, if in a position to contest the action of the board.

It is not possible, therefore, from the language of this statute, to infer that there was in the minds of its framers any distinction as to the jurisdiction they were conferring upon this board, between claims derived from the Spanish or Mexican government, which were perfect under the laws of those governments, and those which were incipient, imperfect, or inchoate.

Undoubtedly, under the powers which these commissioners had to examine into the existing claims, there would be a difference in the principles of decision which they would apply, as to their validity, between a perfected title under the Mexican government and one which was merely incipient, and which the board might reject as unworthy of confirmation for many reasons. Of this the statute takes no note, except that it provides that the principles on which the commissioners are to act shall be those mentioned in the eleventh section, above quoted.

Nor is there any reason, in the policy upon which the stat-

ute is founded and the purposes it was intended to subserve, why this distinction should be made.    Obviously it was not intended to adjust or settle titles between private citizens making claim to the same lands.    It is equally clear that the main purpose of the statute was to separate and distinguish the lands which the United States owned as property, which could be sold to others, either absolutely or by permitting them to settle thereon with preëmption rights, or which could be reserved from public sale entirely, from those lands which belonged, either equitably or legally, to private parties under a claim of right derived from the Spanish or Mexican governments.

When this was done the aim of the statute was attained. The order of the commissioners or the decree of the court established as between the United States and the private citizen the validity or the invalidity of such claims, and enabled the government of the United States, out of all its vast domain, to say "this is my property," and also enabled the claimant under the Mexican government who had a just claim, whether legal or equitable, to say "this is mine."    This was the purpose of the statute; and it was equally important to the object which the United States had in the passage of it, that claims under perfect grants from the Mexican government should be established as that imperfect claims should be established or rejected.

The superior force which is attached, in the argument of counsel, to a perfect grant from the Mexican government had its just influence in the board of commissioners, or in the courts to which their decisions could be carried by appeal.    If the title was perfect, it would there be decided by a court of competent jurisdiction, holding that the claim thus presented was valid; if it was not, then it was the right and the duty of that court to determine whether it was such a claim as the United States was bound to respect, even though it was not perfect as to all the forms and proceedings under which it was derived. So that the superior value of a perfected Mexican claim had the same influence in a court of justice which is now set up for it in an action where the title is contested.

Nor can it be said that there is anything unjust or oppressive in requiring the owner of a valid claim, in that vast wilderness of lands unclaimed, and unjustly claimed, to present his demand to a tribunal possessing all the elements of judicial functions, with a guarantee of judicial proceedings, so that his title could be established if it was found to be valid, or rejected if it was invalid.

We are unable to see any injustice, any want of constitutional power, or any violation of the treaty, in the means by which the United States undertook to separate the lands in which it held the proprietary interest from those which belonged, either equitably or by a strict legal title, to private persons. Every person owning land or other property is at all times liable to be called into a court of justice to contest his title to it. This may be done by another individual, or by the government under which he lives. It is a necessary part of a free government, in which all are equally subject to the laws, that whoever asserts rights or exercises powers over property may be called before the proper tribunals to sustain them.

No doubt could exist, and none whatever would have been suggested, if this statute, instead of requiring the individual claimants to take notice that they were called upon to establish their title and to come forward and do so, had provided that the United States should sue everybody who was found in possession of any land in California at the time the treaty was made, and thus compel him to produce his title, if he had any. Such suits would have been sustained without hesitation, as being legal, constitutional and according to right. What difference can it make, then, that the party who is supposed to possess all the evidences which exist to support his claim is called upon to come before a similar tribunal and establish it by a judicial proceeding? It is beyond question that the latter mode is the more appropriate one to carry out the object intended, and better calculated to save time and expense, both to the government and to the party, and to arrive at safe and satisfactory conclusions.

The government of the United States, when it came to the consideration of this statute, was not without large experience

in a somewhat similar class of cases arising under the treaties for the purchase of Florida from Spain and of the Territory of Louisiana from France. In the latter case, particularly, a very much larger number of claims by private individuals existed to the soil acquired by the treaty, some of whom resided on the land which they claimed, while others did not; and the titles asserted were as diverse in their nature as those arising under the cession from Mexico. The Territory of Louisiana was held for many years by Spain, then by France, and the mode of acquiring rights, claims and titles to the public lands had been pursued according to the forms prescribed by those two governments, so that, upon its transfer to the United States, Congress was engaged for a long series of years in the business of establishing the valid claims and rejecting those which were invalid. There were in those cases many titles which had been perfected under the Spanish and French laws, as well as those which were in the most incipient stage of the assertion of rights.

It is not profitable perhaps to go into the details of the various acts of Congress passed upon the subject, most of which were enacted in the interest of private claimants, and many of which were designed to remove the bar which had come to exist by reason of delays and failures to comply with the statutes in regard to the presentation of such claims. Congress appointed commissioners to investigate claims, who were to report to that body, and generally reserved the right of rejecting or confirming those reports. They changed the form and the number of these officers, the rules by which they should be guided, and the times limited for the assertion of private land claims; indeed, it is almost safe to say that some legislation may still be wanting, and may still be had, to do justice to unfortunate parties who have thus far not obtained the advantages of establishing their rights.

The wisdom, therefore, of the present act in regard to the land claims in California is manifest by a comparison with those earlier statutes in which Congress undertook to do the same thing which it desired to do in the act of 1851, but which failed for want of a clear, satisfactory and simple mode of

doing it, by bringing all the parties before a tribunal essentially judicial in its character, whose decisions should be final without further reference to Congress. But to have the benefit of the superiority of the plan of 1851 over former modes of establishing private rights to lands acquired by treaty, the later statute must be carried out in accordance with the intention found in its provisions.

This view has, we think, been established and prevailed without limitation or contradiction in the decisions of this court from the earliest period when it could be raised here under the statute. In the case of *Fremont* v. *United States*, 17 How. 542, 553, the Supreme Court, in the opinion delivered by Chief Justice Taney, said:

"It will be seen from the quotation we have made, that the 8th section embraces not only inchoate or equitable titles, but legal titles also; and requires them all to undergo examination and to be passed upon by the court. The object of this provision appears to be, to place the titles to land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of the country, in a manner and form that will prevent future controversy.

"In this respect it differs from the act of 1824, under which the claims in Louisiana and Florida were decided. The jurisdiction of the court, in these cases, was confined to inchoate equitable titles, which required some other act of the government to vest in the party the legal title or full ownership. If he claimed to have obtained from either of the former governments a full and perfect title, he was left to assert it in the ordinary forms of law, upon the documents under which he claimed. The court had no power to sanction or confirm it when proceeding under the act of 1824, or the subsequent laws extending its provisions."

In the subsequent case of *United States* v. *Fossatt*, 21 How. 445, 447, this proposition is repeated in the most emphatic language, as follows:

"The matter submitted by Congress to the inquiry and determination of the board of commissioners by the act of

the 3d of March, 1851, (9 Stat. 632, § 8,) and to the courts of the United States on appeal, by that act and the act of 31st August, 1852, (10 Stat. 99, § 12,) are the claims 'of each and every person in California, by virtue of any right or title derived from the Spanish or Mexican government.' And it will be at once understood that these comprehend all private claims to land in California.

"The effect of the inquiry and decision of these tribunals upon the matter submitted is final and conclusive. If unfavorable to the claimant, the land 'shall be deemed, held and considered as a part of the public domain of the United States;' but if favorable, the decrees rendered by the commissioners or the courts 'shall be conclusive between the United States and the claimants.'

"These acts of Congress do not create a voluntary jurisdiction, that the claimant may seek or decline. All claims to land that are withheld from the board of commissioners during the legal term for presentation, are treated as non-existent, and the land as belonging to the public domain."

In the case of *United States* v. *Castillero*, 2 Black, 17, 158, it was said:

"Power to decide upon the validity of any claim presented to land in California, by virtue of any right or title derived from the Spanish or Mexican government, as matter of original jurisdiction, is, by the act of the 3d of March, 1851, exclusively conferred upon the commissioners appointed under the first section of that act."

In the case of *Newhall* v. *Sanger*, 92 U. S. 761, 764, it was said, in speaking of the statute of 1851, that "claims, whether grounded upon an inchoate or a perfected title, were to be ascertained and adequately protected."

We will only refer to one other case, that of *More* v. *Steinbach*, 127 U. S. 70, 81, decided at the last term, where the whole subject was carefully reviewed in the opinion of Mr. Justice Field. In regard to the question now before us the court in that opinion said:

"It follows from what is thus said that it would be a sufficient answer to the contention of the defendants, that the

grant under which they claim to have acquired a perfect title conferred none. The grantees were not invested with such title, and could not be, without an official delivery of possession under the Mexican government, and such delivery was not had, and could not be had, after the cession of the country, except by American authorities acting under a law of Congress. But independently of this consideration, and assuming that the title under the grant was perfect, the obligation of the grantee was none the less to present his claim to the board of land commissioners for examination. The ascertainment of existing claims was a matter of vital importance to the government in the execution of its policy respecting the public lands; and Congress might well declare that a failure to present a claim should be deemed an abandonment of it, and that the lands covered by it should be considered a part of the public domain."

·It is said by counsel for defendant in error that there would never have been any doubt upon this·question were it not for certain dicta in the cases here referred to. We are unable to perceive any sufficient reason for calling these expressions of the court, whose judgment must be final on the subject, "dicta," for we feel bound to say, that they were observations pertinent·to the matter under consideration, and seem to have met the entire approbation of the court in whose behalf they were uttered; and as they embraced a very considerable period of time, during which a contrary opinion would have saved much labor to the court, we must believe that the opinions thus expressed without variation were the well-considered views of this court when they were delivered.

A careful examination of the decisions of the Supreme Court of California on this subject will show that if they do not absolutely support this view, they contain nothing contrary to it, until the case of *Minturn* v. *Brower*, 24 Cal. 644. That court, in the case of *Teschemacher* v. *Thompson*, 18 Cal. 11, said:

"By the act of March 3, 1851, the government has afforded the means of protecting all titles, legal or equitable, acquired previous to the cession. Its power to thus provide . . . results from the fact that it is·sovereign and supreme as to all mat-

ters connected with the treaty and the enforcement of the obligations incurred thereunder. . . . It must determine for itself what claims to property existed at the date of the treaty."

And so in *Semple* v. *Hagar*, 27 Cal. 163, shortly after the decision of *Minturn* v. *Brower, supra,* the court used the following language :

"The court will take judicial notice that, according to the provisions of the act of Congress of March 3, 1851, every person claiming lands in California, by virtue of any right or title derived from the Spanish or Mexican government, should present his petition for the confirmation of his title to the board of land commissioners, and that such proceedings must be had thereupon, before said board or the District or Supreme Court of the United States, that a final decree confirming the title of the claimant to the land must be entered before the patent for the land could be issued. A patent could not be issued for the land claimed under a Mexican grant, unless such proceedings were first had for the confirmation ; and it is not pretended that they were not had in respect to the Jimeno grant. The patent was issued only in pursuance of the decree of confirmation, and for the purpose of carrying it into effect."

These cases show that the doctrine has not been considered as well settled in California against the views herein expressed until the case now before us, or rather until that of *Phelan* v. *Poyoreno,* 74 Cal. 448, was decided, which is referred to by the court as the foundation of its judgment in the present action. That case was argued before a commission of the Supreme Court, whose judgment was adopted by the Supreme Court of the State, under a law of California which prescribes this mode of appellate jurisdiction.

Upon the mere question of authority these decisions of the Supreme Court of the United States, and of the Supreme Court of California, would be decisive against the judgment of the latter court in this case. But we are quite satisfied that upon principle, as we have attempted to show, there can be no doubt of the proposition, that no title to land in California, dependent upon Spanish or Mexican grants can be of any

validity which has not been submitted to and confirmed by the board provided for that purpose in the act of 1851; or, if rejected by that board, confirmed by the District or Supreme Court of the United States.

This proposition requires that the judgment of the Supreme Court of California in the case before us be

*Reversed, and the case remanded to that court for further proceedings in conformity with this opinion.*