**UNITED STATES of America**

v.

**John B. ELDER.**

**Crim. No. B–84–276.**

United States District Court,
S.D. Texas,
Brownsville Division.

Feb. 13, 1985.

Gilberto Hinojosa, Brownsville, Tex., Daniel Sheehan, Washington, D.C., Lisa Brodyaga, Harlingen, Tex., for John Elder.

Robert L. Guerra, Asst. U.S. Atty., McAllen, Tex., for U.S.

## OPINION ON MOTIONS TO DISMISS

HEAD, District Judge.

### I. INTRODUCTION

The United States accused the Defendant John B. Elder of unlawfully transporting three undocumented Salvadoran aliens in violation of 8 U.S.C. § 1324(a)(2). Elder filed various motions to dismiss, including motions based on freedom of religion, domestic and international refugee law, selective prosecution, and estoppel. He also filed a motion to suppress based on an allegedly improper showup. After extensive pretrial evidentiary hearings, the Court, in open court, denied all motions to dismiss and the motion to suppress. This opinion discusses only those motions which the Court feels are sufficiently unique to merit a written opinion.

### II. FACTS

Elder is the director of the Casa Oscar Romero (Casa Romero), named in honor of the assassinated Roman Catholic Archbishop of El Salvador. Casa Romero, located in San Benito, Cameron County, Texas, provides assistance and shelter to Central Americans, principally Salvadorans, who have fled Central America and entered the United States. Elder considers these persons "refugees" under the Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 102, and international law. Elder regards Casa Romero as a sanctuary in the biblical sense. The testimony indicated that the Casa Romero was founded in December, 1982, on land donated by the Roman Catholic Diocese of Brownsville. Parishes and congregations of various religious affiliations donated seed money and continue to provide financial support for the Casa Romero. The Roman Catholic Diocese of Brownsville plays a financial and leadership role in the operation of the Casa Romero.

On March 12, 1984, Elder transported three undocumented Salvadorans six miles from the Casa Romero to a bus station in Harlingen, Texas, within the Rio Grande Valley. Without permission or documentation, these aliens together had entered the United States earlier that same day in the vicinity of the Matamoros-Brownsville International Bridge. The Salvadorans then walked twenty-five miles to San Benito, where they were directed to the Casa Romero. After they ate and rested at the Casa Romero, the Salvadorans asked Elder for a ride to the Harlingen bus station. The Salvadorans planned to go north to Houston on the bus through the Border Patrol checkpoint located north of Harlingen on U.S. Highway 77. Elder complied with the Salvadorans' request by taking them to the Continental Trailways Bus Station in Harlingen. Elder knew of the Salvadorans' plan to go to Houston.

Two Border Patrol agents saw the three Salvadorans get out of Elder's vehicle in front of the bus station. After the agents recorded the license plate number of the vehicle, the agents detained the Salvadorans and took them to the Harlingen Border Patrol office. A license plate check revealed that the car was registered to Elder. An agent of the Immigration and Naturalization Service (INS) later returned the Salvadorans to the Casa Romero, where the Salvadorans identified Elder. At the pretrial evidentiary hearing, the Salvadorans and the Border Patrol agents identified Elder as the driver of the vehicle.

### III. MOTION TO DISMISS—FREEDOM OF RELIGION

Elder contends that his First Amendment right to exercise religion entitles him to put into practice his religious beliefs, which includes providing shelter and transporta-

tion for Salvadoran aliens, even if those practices clash with the statutory prohibitions of 8 U.S.C. § 1324(a)(2). Courts have recognized that the exercise of religious freedom can sometimes excuse criminal conduct, *see Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *People v. Woody,* 61 Cal.2d 716, 40 Cal. Rptr. 69, 394 P.2d 813 (1964); however, the Supreme Court has determined that the enforcement of criminal laws can be constitutionally achieved even if the laws interfere with the religious practices of individuals. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Reynolds v. United States,* 8 Otto 145, 98 U.S. 145, 25 L.Ed. 244 (1878). The First Amendment "embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell v. Connecticut,* 310 U.S. at 303–04, 60 S.Ct. at 903.

■ Recent court decisions describe the appropriate analysis to resolve the conflict between the prohibitions of a criminal statute and the perceived mandates of religious practice. Elder bears the initial burden to demonstrate that religious beliefs motivated his conduct. The burden then shifts to the Government to justify placing limitations on the religious conduct. The Government must show that such limitations are essential to accomplish a compelling governmental interest. The limitation on religion must not exceed the least burdensome method of accomplishing the Government's purpose without infringing First Amendment rights. *Peyote Way Church of God, Inc. v. Smith,* 742 F.2d 193, 200 (5th Cir.1984); *see United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

■ When a defendant presents evidence to meet his initial burden, the Court must be careful and deferential in examining the Defendant's beliefs. The Supreme Court notes that the determination of what constitutes a religious belief or

practice presents "a most delicate question." *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533. The Court should neither interpret canon law nor define the parameters of a religion. *See Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981).

■ The Court finds that Elder has met his initial burden. He is a Roman Catholic who feels a charitable Christian commitment, founded in the Gospel, which motivates him to assist those who flee the violence in El Salvador. Elder presented the testimony of various Christian clergymen who confirmed that assistance to those in need remains a fundamental aspect of Christianity. Bishop John Fitzpatrick, Bishop of the Roman Catholic Diocese of Brownsville, testified that meeting material human needs represents an essential aspect of Christianity, and that each individual remains free to fulfill this obligation according to the directives of his or her own conscience. Although no law of the Roman Catholic Church specifically requires Roman Catholics to provide sanctuary or rides to Salvadorans, Bishop Fitzpatrick believes that providing such assistance constitutes an appropriate expression of the Christian gospel. According to the testimony of the various ministers, this conclusion also holds true in other denominations. These ministers included Donovan Cook of the American Baptist Church, James Andrews of the Presbyterian Church, John Steinbrook of the Lutheran Church, and Gilbert Dawes and John Soper of the United Methodist Church. The Government called no witnesses to oppose the testimony of these ministers.

Elder feels a religious commitment to assist Salvadorans because of the political turbulence in that country. An insurgent movement currently exists in El Salvador which continues to battle government forces. Elder filed numerous statements from alleged eyewitnesses who describe a brutal situation in El Salvador. According to these statements and testimony in court,

the conflict in El Salvador has resulted in much violence and many atrocities directed at the civilian population from both sides. The testimony contains graphic descriptions of torture, murder, brutalities, and disappearances. The violence has included church workers among its victims.

Although the Court has no reason to doubt the description of tragedy and horror in El Salvador, the Court need only find that Elder believed that such violence actually occurred. This Court has no responsibility to make factual findings concerning the situation in El Salvador. The Court need not make any foreign policy judgments in order to conclude that, in assisting the Salvadorans, Elder acted in accordance with his personal view of Christianity. The Bishop of the Brownsville Diocese believes that Elder is a religious man who practiced his Roman Catholicism when he transported the Salvadorans. According to the Bishop, as a practicing Roman Catholic, the expression of Elder's inner religious thoughts can properly be evidenced by charitable social action, such as assistance to undocumented Central Americans.

The Court understands that other members of the Roman Catholic faith may oppose Elder's activist response to the situation in Central America. The Court emphasizes that it is not an arbiter of canon law. The Court simply finds that Elder fulfilled his Christian obligations as he genuinely perceived them to be and that Elder presented substantial testimony to support his view of Christianity. This Court's conclusions are not intended to define the Christian Gospel or Christian response to it. The Court need not correctly interpret Christian doctrine in order to hear the position of the Defendant.

Because Elder meets his initial burden, the Government must show an overriding interest to justify prosecution. The Court finds that the Government meets its burden to demonstrate an overriding interest in protecting a congressionally-sanctioned immigration and naturalization system designed to maintain the integrity of this Nation's borders. In discussing the importance of United States' immigration laws, the Supreme Court has repeatedly empha-

sized the importance which sovereign nations place upon controlling entry through their borders. In *Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972), the Supreme Court agreed that controls over immigration are "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government...." In *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) [*quoting Oceanic Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)], the Supreme Court underscored the limited role of the judiciary with respect to immigration and reemphasized that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."

■■■ The ability to control entry and to identify those admitted remains vital to the welfare and security of the people. *See The Japanese Immigrant Case,* 189 U.S. 86, 96–97, 23 S.Ct. 611, 613, 47 L.Ed. 721 (1903); *Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 123–24, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (1967). Circumvention by individuals of the congressionally-prescribed procedure for entry, even if religiously motivated, undermines the historically legitimate goals of immigration control. Protection of the borders represents a national obligation fulfilled by the Government for the benefit of all Americans. *See The Chinese Exclusion Case,* 130 U.S. 581, 603–07, 9 S.Ct. 623, 629–30, 32 L.Ed. 1068 (1889). Elder's do-it-yourself immigration policy, while charitable, gives away what is not his to give away—the Government's legitimate right to examine every person who enters the country so that the Government can make informed decisions on who will be admitted.

The United States retains interests in immigration control for security reasons. Richard Casillas, District Director for the INS in San Antonio, Texas, explained that

potential immigrants must submit a biographical data sheet for review by law enforcement agencies. The goal of this system of immigration control is to prevent entry by enemies of the state, criminals, and other classifications of immigrants which Congress determines to be undesirable. Without a functional system, the country remains unable to inquire and therefore powerless to control. The INS also faces problems with counterfeit identification and documentation obtained by aliens who wish to assimilate into American society. Casillas testified that the INS recently redirected its limited resources to deal with the growing problem of undocumented aliens who make fraudulent applications to receive benefits under entitlement programs.

■■■ The parties presented conflicting evidence concerning the beneficial or harmful impact exerted by undocumented workers upon the labor market and the national economy. David North, an immigration researcher who testified for the Government, concluded that undocumented aliens drained social resources, depressed wages, displaced minority and women workers, and impeded technological development in some sectors of the economy. Thomas Muller, an expert for the defense, found that undocumented immigrants filled unwanted jobs and helped to create new jobs and prosperity. Another defense expert, Gilberto Cardenas, testified that undocumented aliens adversely affected local funds for social services, but that the State of Texas as a whole received a net benefit from contributions paid by undocumented aliens into the state's social programs. This existing controversy among experts proves, first, that the economic impact of illegal immigration remains unresolved and, second, that the Court should not resolve the dispute. As long as the issue persists, Congress remains entitled to examine the immigration question and to pass legislation to address the problems which Congress discovers. Congress may direct the executive to account for each individual who enters the country and to make appropriate decisions in the best interest of all Americans.

The Court must also analyze whether the Government utilizes the least burdensome method to accomplish its purpose in securing the Nation's borders. The Court finds that the Government must retain the sole authority to determine who may cross the borders or travel further within the country. If the Government attempted to accommodate into its immigration policy Elder's religious beliefs, the Government's efforts would result in no immigration policy at all. As testimony from Defendant's witnesses indicated, the moral obligation to assist others crosses religious and denominational lines. These widely-held beliefs allow adherents to exercise considerable discretion and would permit religious individuals to form personal immigration policies. *See United States v. Lee,* 455 U.S. at 259–60, 102 S.Ct. at 1056–57. Elder wishes to limit this Court's view solely to the violence in El Salvador; however, the human condition remains miserable in many parts of the globe. Man's inhumanity to man, as well as nature's, has been unrelenting throughout history. Many people live on this planet who logically are no less worthy of Elder's Christian charity than the Salvadorans. The consciences of others religiously motivated may conclude that the starving and impoverished of North Africa, Asia, or Mexico are equally entitled to enter this country without review by the INS.

■■■ Obviously all cannot enter. Congress has recognized in its immigration policy that the United States cannot absorb all who wish to enter this country to take advantage of its relative tranquility and bounty. Congress has therefore established appropriate standards and procedures by which to determine proper entry. The Government, as the representative of all Americans, must retain the sole authority and responsibility to make these hard decisions and has put a system into place which individuals, without regard to their motivations, cannot be allowed to evade. *See The Chinese Exclusion Case,* 130 U.S. at 603–09, 9 S.Ct. at 629–31.

■■■ The United States accepts applications for asylum from all nationalities, in-

cluding Salvadorans, under a procedure which takes into account the social and political conditions which exist in their homelands. *See generally* Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 102. Title 8 U.S.C. § 1158(a) authorizes the Attorney General to establish a procedure for asylum, *see* 8 C.F.R. §§ 208.1–208.16 (1984), which provides protection to applicants who fall under the statutory definition of refugee. Title 8 U.S.C. § 1101(a)(42)(A) includes as refugees those persons unable or unwilling to return to their native countries "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." A potential refugee may enter the country and apply for asylum with the local District Director of the INS. *See* 8 C.F.R. § 208.3(a). All potential refugees also receive the opportunity to submit applications for asylum during exclusion or deportation proceedings before an immigration judge. *See* C.F.R. §§ 208.3(a), 208.9. Those denied asylum by an immigration judge may appeal the decision within the INS. The testimony indicates that some Salvadorans have petitioned for and received asylum. Petitioners who are denied asylum have recourse to all levels of the federal courts for review of the decision, *see Ramirez-Osorio v. Immigration and Naturalization Service*, 745 F.2d 937, 946 n. 15 (5th Cir.1984), including the United States Supreme Court. *See Immigration and Naturalization Service v. Stevic*, —— U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

 This Court finds that implementation of the immigration laws represents an important Government interest which, on balance, justifies enforcement of § 1324(a)(2) against Elder. The Court also finds that the Government utilizes the least burdensome method by which to accomplish its goals, especially since nothing in this decision prohibits the exercise of Christian charity to those who present themselves before the INS to apply for asylum and who proceed under INS rules. *See United States v. Pereira-Pineda*, 721 F.2d 137 (5th Cir.1983). The Court accordingly

denies the motion to dismiss based on free exercise of religion.

## IV. MOTIONS TO DISMISS UNDER DOMESTIC AND INTERNATIONAL LAW

Elder introduces various motions to dismiss based on domestic and international refugee law. Elder's motions based on domestic law essentially argue that 8 U.S.C. § 1253(h) entitled the Salvadoran aliens that he transported to remain in the United States because they fall under the definition of refugee. Section 1253(h), as amended by the Refugee Act of 1980, provides that the Attorney General "shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Elder asserts that because the Salvadorans he transported qualified for protection as refugees, the Government cannot prove that the aliens were present unlawfully, an essential element of § 1324(a)(2). *See United States v. Shaddix*, 693 F.2d 1135, 1137–38 (5th Cir.1982). The Defendant argues that his assistance to the Salvadorans remained perfectly legal, and he requests dismissal of the indictment.

 The Court refuses the invitation to circumvent the statutory scheme and declines to dismiss the indictment. Fifth Circuit law clearly holds that before Salvadoran aliens may reside legally within this country they must submit applications for asylum with the Government. *United States v. Pereira-Pineda*, 721 F.2d 137 (5th Cir.1983); *see Martinez-Romero v. Immigration and Naturalization Service*, 692 F.2d 595, 595–96 (9th Cir.1982). The Defendant essentially asks the Court to make a finding of fact concerning the refugee status of the Salvadorans. Title 8 U.S.C. § 1158 and § 1253(h), however, authorize the Attorney General to determine the refugee status of an individual. The statutes do not permit either the Court or the Defendant to determine the refugee status of the Salvadorans, nor can the Court submit

such an issue to a jury. Under the statutory scheme, the decision lies exclusively with the Attorney General, subject to appropriate avenues of judicial review. *See Ramirez-Osorio v. Immigration and Naturalization Service,* 745 F.2d 937, 946 n. 15 (5th Cir.1984).

The Defendant also argues that international laws and treaties automatically entitle the aliens to receive refugee status without regard to our own national laws. The Court concludes that Congress intended the Refugee Act of 1980 to fulfill its obligations under international law, *see Immigration and Naturalization Service v. Stevic,* — U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), and this Act designates the Attorney General to determine refugee status. Congress also indicated that the Government should review applications from Salvadorans on a case-by-case basis. *See* Pub.L. 97–113, § 731, 95 Stat. 1519. The Court cannot interfere with political decisions which the United States as a sovereign nation chooses to make in the interpretation, enforcement, or rejection of treaty commitments which affect immigration. *See The Chinese Exclusion Case,* 130 U.S. 581, 9 S.Ct. 623 (1889); *Botiller v. Dominguez,* 130 U.S. 238, 247, 9 S.Ct. 525, 527, 32 L.Ed. 926 (1889); *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); 74 Am.Jur.2d *Treaties* §§ 14, 36 (1974). The Court accordingly denies Defendant's motions to dismiss under domestic and international refugee law.