TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

|  |  |  |
|---|---|---|
| OPINION | : | No. 92-607 |
| of | : | |
| | : | November 19, 1992 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE QUENTIN L. KOPP, MEMBER OF THE CALIFORNIA SENATE, has requested an opinion on the following question:

May a city prohibit its officers and employees from cooperating in their official capacities with Immigration and Naturalization Service investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of the federal immigration laws?

CONCLUSION

Due to the supremacy clause of the United States Constitution, a city may not prohibit its officers and employees from cooperating in their official capacities with Immigration and Naturalization Service investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of the federal immigration laws.

ANALYSIS

We are asked to determine whether it is permissible for a city to enact an ordinance prohibiting cooperation by city officers and employees with the Immigration and Naturalization Service ("INS") which might assist the federal agency in detecting persons whose presence in this country violates the civil provisions of the Immigration and Nationality Act (8 U.S.C. § 1101, et seq.; "Act").[1] Specifically, the ordinance prohibits city officers and employees from using, in their official capacities, any city resources to cooperate with INS investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws or to gather or disseminate information regarding the immigration status of individuals in the city. We

_____

[1] The civil provisions of the Act apply to persons who are illegally present in this country and thus subject to deportation.

are advised that the stated purpose of the ordinance is to encourage persons who are illegally present in this country to report criminal activities which they observe to local law enforcement officers.

It is posited that under the ordinance, city police officers may not notify the INS of lawfully obtained information regarding the immigration status of any person arrested; INS agents are not to be given access to the city's records to review such information.

When a peace officer lawfully comes across information in the course of investigating a crime which reasonably leads to the belief that the person arrested is illegally present in this country, neither the state nor federal Constitution prevents the officer from advising the INS of such information. (*Gates* v. *Superior Court* (1987) 193 Cal.App.3d 205, 219.) We have previously determined that although there is no general affirmative legal duty imposed on California judges and peace officers to report to the INS knowledge that they might have of persons being unlawfully present in the United States,[2] public officials may report that knowledge if they choose to do so unless it was learned in a manner made confidential by law. (67 Ops.Cal.Atty.Gen. 331 (1984).)[3] We stated:

> "The Immigration and Naturalization Act is the law of this land and it is an `act of responsible citizenship' and the `duty' and the right of every citizen to assist in prosecuting and securing punishment for its breach by giving whatever information he or she may have in that regard to aid those who enforce it." (*Id.*, at p. 340.)

In *Gates* v. *Superior Court, supra*, 193 Cal.App.3d 205, 219, the Court of Appeal observed:

> "Where otherwise warranted investigation by local officers leads to evidence of a federal civil or criminal violation, the local authority has the right to exchange information with federal authorities; to deny such an exchange is not reasonable and rewards those federal violators fortunate enough to be arrested by local, rather than federal, officials."

It is against this background that we analyze the constitutional validity of the city ordinance in question.

The Act is a comprehensive legislative scheme intended to govern all aspects of the admission of aliens to the United States. (*National Center for Immigrants' Rights* v. *I.N.S.* (9th Cir.

---

[2]  However, as pointed out in our prior opinion, Health and Safety Code section 11369 does provide:

> "When there is reason to believe that any person arrested for a violation of [specified drug-related offenses] may not be a citizen of the United States, the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters."

[3]  Such transfers of arrest information do not constitute enforcement of the civil provisions of the Act. (*Gates* v. *Superior Court, supra*, 193 Cal.App.3d 205, 219.) Local agency arrests for civil violations of the Act are deemed to intrude impermissibly on the federal preserve. (*Id.*, at p. 218.) On the other hand, federal immigration laws do not preclude local enforcement of the criminal provisions of the Act. (*Gonzales* v. *City of Peoria* (9th Cir. 1983) 722 F.2d 468, 475.)

1990) 913 F.2d 1350, 1358.)  The United States Supreme Court "has repeatedly emphasized that `over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  (*Fiallo v. Bell* (1977) 430 U.S. 787, 792.)  "The ability to control entry and to identify those admitted remains vital to the welfare and security of the people."  (*United States v. Elder* (S.D. Tex. 1985) 601 F.Supp. 1574, 1578; see also *Boutilier v. Immigration and Naturalization Service* (1967) 387 U.S. 118, 123-124;  *The Japanese Immigrant Case* (1903) 189 U.S. 86, 96-97.)

Here, the city ordinance establishes city policy vis-a-vis application of the civil provisions of the Act to undocumented aliens within the city.  The ordinance thus concerns a subject matter, immigration, wherein federal power to regulate is exclusive.  (See *De Canas* v. *Bica* (1975) 424 U.S. 351, 354-355.)  However, as pointed out in *De Canas* v. *Bica*, "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country and the conditions under which a legal entrant may remain."  (*Id.*, at p. 355.)[4]

The city's ordinance seeks to preclude cooperation by city officers and employees with the INS such that the risk of detection faced by undocumented aliens is not affected by any contact with city personnel.  In so doing, the ordinance makes it possible for an undocumented alien to move more freely within the community and diminishes the likelihood than an alien's arrest on a state charge will result in an INS "detention hold" being placed on that individual.  Thus, although the ordinance does not directly regulate immigration, it regulates an integrally related subject matter -- the detection of persons whose presence in this country may violate the civil provisions of the Act.  Obviously, only upon detection may deportation proceedings be commenced.  Such proceedings are central to the enforcement of the Act.

When a state or local governmental entity enacts legislation which involves federal prerogatives, the application of the supremacy clause of the United States Constitution[5] must be considered.  (See *De Canas* v. *Bica, supra,* 424 U.S. 351, 356.)  One situation in which federal preemption of local legislation occurs is when the local enactment "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67.)  "[E]ven absent . . . a manifestation of congressional intent to `occupy the field,' the Supremacy Clause requires the invalidation of any state legislation that burdens or conflicts in any manner with any federal laws or treaties."  (*De Canas* v. *Bica, supra,* 424 U.S. 351, 357, fn. 5.)  This particular preemption test "is applied when there is room in the subject area for both federal and local regulation" and "requires the court to examine both statutory schemes to determine if they can co-exist or if they conflict."  (*Rogers* v. *Larson* (3rd Cir. 1977) 563 F.2d 617, 621.)

---

[4]  For purposes of federal preemption, local ordinances are treated in the same manner as state statutes.  (See *Hillsborough County* v. *Automated Medical Laboratories, Inc.* (1985) 471 U.S. 707, 713.)

[5]  The supremacy clause provides as follows:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby; any thing in the Constitution or laws of any state to the contrary notwithstanding."  (U.S. Const., art. VI, cl. 2.)

In *United States* v. *City of Philadelphia* (3rd Cir. 1986) 798 F.2d 81, the court examined whether Philadelphia could prohibit Temple School of Law from allowing a federal agency on campus to recruit for the armed services. The city's ordinance banned employment recruiting based on an individual's sexual orientation, and "the Army, Navy, and Marine Corps do not accept homosexuals as members of the uniformed services." (*Id*., at p. 84.) The court found a conflict between the city's order implementing its ordinance and the federal policy supporting on-campus military recruiting. The court analyzed the issue as follows:

"The task presently before us, then, is to determine whether the Ordinance, as applied to the Law School by the Order, `*conflicts* with Congressional legislation or with any discernible Congressional policy.' [Citation.] While ostensibly a question of governmental immunity, [citation] this issue is perhaps `best understood as posing an issue essentially of federal preemption.' [Citation.] Viewed in this light, the Order `conflicts' with federal law if, and to the extent that, it `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]

"In conducting this inquiry, we remain mindful of the fact that `[a]n unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous.' [Citations.]

" . . . . . . . . . . . . . . . . . . . . . . .

"Given . . . the funding prohibitions contained in the DDA Acts of 1971 and 1973, and the NASAA Act of 1969, it is obvious that the Commission's Order conflicts with a `discernible Congressional policy.' [Citation.] The Order absolutely prohibits the cooperation that Congress intended this legislation to engender and, as a result, military recruiters are denied the access that Congress deemed critical to their ability to conduct `intensive recruiting campaigns.'

"Nonetheless, the Supreme Court has cautioned that `"a mere conflict in words is not sufficient"; the question remains whether the "consequences [of the state regulation] sufficiently injure the objectives of the federal program to require nonrecognition."' [Citations.] We interpret this statement to mean, in the present circumstances, that if the Order does not significantly impair the military's ability to recruit doctors, lawyers, and other skilled personnel, the fact that it conflicts with Congress' policy of promoting on-campus recruiting by the military would not permit us to invalidate the Order.

" . . . . . . . . . . . . . . . . . . . . . . .

" . . . We believe that it is appropriate to consider the Order's effect on military recruiting on Temple's campus generally, as well as its impact on military recruiting on other college and university campuses throughout the City, and the possibility that other jurisdictions may adopt a similar interpretation of their anti-discrimination ordinances. [Citation.] We cannot conceive of any reason why the Commission would prohibit the military from recruiting lawyers at Temple, yet permit it to recruit doctors or engineers at the University of Pennsylvania. Nor can we conceive of any reason why other jurisdictions with similar laws would adopt a construction different from that adopted by the Commission. Rather, these

considerations simply underscore the fact that the Order has `the potential to frustrate' effective military recruiting, both in Philadelphia and throughout the nation. [Citation.]

"Finally, while we agree . . . that, under the DDA Act of 1973 and its predecessor legislation, each college and university retained the `absolute right to determine whether it desires to have any association with the military forces of its country, and this includes the right to determine whether it desires to permit military recruiters . . . on its campus' [citation], we do not believe that this detracts from our conclusions that Congress considers on-campus recruiting to be an integral part of its military recruiting policy, and that the Order significantly impairs the military's ability to recruit the skilled personnel it requires.

"We conclude, therefore, that the Order conflicts with a clearly discernible Congressional policy concerning military recruitment on the campuses of this nation's colleges and universities. . . .

"In reaching this conclusion we freely concede that the issues raised by the Commission are difficult given the traditional importance of the City's interest, under its police power, in eradicating employment discrimination. But our conviction that the Order cannot stand is highlighted by one critical fact: in most (if not all) of the reported cases involving questions of governmental immunity, it was at least theoretically possible for the persons involved to comply with both the state and federal policies involved. . . .

"In the present case, on the other hand, there is nothing that Temple can do to enable it to permit the military to conduct on-campus interviews. Quite to the contrary, given the Order, Temple is barred from cooperating with the military unless and until the United States changes its employment policy with respect to homosexuals. Under these circumstances, we believe that the Commission has no more right to enforce the Ordinance against Temple than did the Town of Windsor to enforce its building permit regulations against the contractor hired to construct a top-secret federal research facility. [Citation.]" (*Id.*, at pp. 85-89; fns. omitted.)

Similarly, the ordinance with which we are concerned creates a conflict with a federal program. It prohibits city cooperation with the INS in the administration of the civil provisions of the Act. Such administration is predicated upon the ability of the INS to detect the presence of those who are not lawfully residing in this country. Congress surely did not intend that state and local governments would undermine the deterrent effect of the criminal or civil penalties contained in the Act.[6] By giving the impression that illegal aliens may obtain refuge from such penalties in a particular locale, the ordinance creates localized immigration policy and dissipates enforcement of the federal laws.

That Congress has placed great importance on the immigration detection effort is evidenced by the criminal penalties which have been established for those who assist illegal aliens in escaping detection. (8 U.S.C. § 1324; see *United States v. Rubio-Gonzales* (5th Cir. 1982) 674

---

[6] Section 115 of the 1986 amendments to the Act states that "the immigration laws of the United States should be enforced vigorously and uniformly. . . ."

F.2d 1067, 1073; *United States v. Cantu* (5th Cir. 1977) 557 F.2d 1173, 1180; *United States v. Lopez* (2d Cir. 1975) 521 F.2d 437, 444; 67 Ops.Cal.Atty.Gen. 331, 338, fn. 16 (1984).)[7] This discernible congressional policy is substantially frustrated by a city ordinance impeding the right and the duty of city officials and law enforcement personnel to report, in the course of their official duties, possible violations of the Act to the proper federal authorities.[8] As one of the principal collection points for legally obtainable, non-confidential information about persons who may be unlawfully present in this country, local law enforcement agencies constitute an important component of the overall effort to effectuate the civil provisions of the Act. By peremptorily removing such a significant component from enforcement activities, the city's ordinance stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz*, *supra*, 312 U.S. 52, 67.)[9]

---

[7]  Section 1324 of title 8 of the United States Code provides in part:

"(a)  Criminal Penalties

"(1)  Any person who --

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(C)  knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; or

"(D) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law, shall be fined in accordance with Title 18, or imprisoned not more than five years, or both, for each alien in respect to whom any violation of this paragraph occurs."

[8] "Since a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself" (*North Dakota* v. *U.S.* (1990) 495 U.S. 423, 438), it is of no consequence that the ordinance here would operate upon city officials and employees rather than directly upon INS agents. Also, because of the conclusion we reach, we need not consider the First Amendment rights of city officers and employees to communicate with INS agents or their possible obligations under any oaths of office.

[9]We note that the ordinance allows cooperation with INS agents if such assistance is required by federal or state statute or regulation or court decision. The supremacy clause, however, is violated here without a direct court decision ordering the city to comply with the federal Constitution. It is the ordinance's creation of an "obstacle" to the objectives of Congress that is impermissible, regardless of what the ordinance may otherwise allow. A *direct* conflict with a federal or state statute or regulation presents a separate and distinct basis for the preemption of a local ordinance. (See *Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143; *Savage* v. *Jones* (1912) 225 U.S. 501, 533; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 856; *Ex parte Daniels* (1920) 183 Cal. 636, 642-645.)

We conclude that due to the supremacy clause of the United States Constitution, a city may not prohibit its officers and employees from cooperating in their official capacities with INS investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of the federal immigration laws.

* * * * *